# Staunton

## JOHN M. MILLER, JR. v. GEORGE S. KEMP.

September 17, 1931.

Present, Prentis, C. J., and Campbell, Holt, Hudgins and Gregory, JJ.

The opinion states the case.

*Arden Howell* and *Page & Leary,* for the appellant, and *Williams & Mullen, James Mullen* and *Ralph T. Catterall,* as *amici curiae.*

*Smith & Gordon,* for the appellee, and *Wiltshire & Rives, Charles E. Plummer, J. Gordon Bohannan* and *Willis W. Bohannan,* as *amici curiae.*

PRENTIS, C. J., delivered the opinion of the court.

George S. Kemp agreed in writing to buy from John M. Miller, Jr., the residence and three lots, corner Seminary and Melrose avenue, Richmond, provided the title should be free from valid objections. Objections were made to the title, for the reasons hereafter stated. Miller then filed his bill praying for specific performance, to which Kemp filed his answer, in which he asked for a declaratory judgment as to his rights; prayed that his answer might be treated as a cross bill; averred that certain judgments against one J. R. Paschall are liens on an undivided one-half of the land he had agreed to buy, convened Paschall and the judgment creditors of Paschall as defendants, and prayed for general relief.

Upon the hearing the trial court entered a decree dismissing the original bill of Miller, and the defendant, Kemp, by counsel, having stated at bar that he did not desire any affirmative relief, the cross bill was, on his motion, dismissed. This appeal by Miller followed.

The facts essential to the determination of the legal questions raised are these:

The Lewis Ginter Land and Improvement Company (hereinafter called the Land Company), on September 23, 1907, entered into a written contract to sell to Thomas Gresham and J. R. Paschall six lots in Ginter Park, then a suburb of Richmond, at the price of $10,451.60, of which $1,045.16 was paid in cash, and the balance, with interest, was to be paid in equal instalments in one, two, three, four

and five years thereafter. There were in the contract quite a number of building restrictions and other restrictions as to the use and sale of the premises. The vendor covenanted to convey the property with general warranty, and the vendees covenanted to execute notes for the deferred payments and to secure them by deed of trust within _____ days from the date of the contract, "provided the title to said real estate be found free from objection, and to sign the conveyance of said real estate for the purpose of making the covenants and agreements and assenting to the conditions and restrictions therein on their part, as herein aforesaid."

Gresham and Paschall had been in the habit of buying and selling real estate together, but had no written partnership agreement. They settled their mutual accounts covering this transaction many years ago.

The provisions of this original contract of sale to Gresham and Paschall were waived, changed or rescinded by the parties thereto, before it became executed, in many particulars: (a) No conveyance was then made in accordance with the Land Company's covenant, no notes for the deferred payments were given, and no deed of trust to secure them was executed by the vendees; (b) within forty-six days, November 8, 1907, the lot "No. 6" was eliminated from the original contract and lot No. 1 (one of those here involved) was substituted therefor. This is evidenced by a memorandum written on the contract signed by the Land Company, Gresham and Paschall, showing that one Charles G. Taylor, then owner of lot No. 1, conveyed it to Gresham, who thereupon conveyed it to the Land Company, which at the request of Gresham then conveyed lot No. 6, included in the original contract, to Taylor; (c) the purchase money was fully paid long before it became due under the contract, for though the deferred payments were due in five annual instalments, $2,458.30 thereof was paid October 31, 1908, and the balance $8,133.49 June 3, 1909; (d) the transfer of title

of the six lots from the Land Company instead of being made to Gresham and Paschall jointly in one conveyance, were by mutual consent made, one to Jennie L. Reed for lots 4 and 5, one to Thomas Gresham for lots 1, 2 and 3, and one to J. R. Paschall for lot No. 13, and these several conveyances were accepted by the parties manifestly in discharge of all the obligations of the Land Company, and of all of the rights of the vendees under the contract. These three deeds were dated May 26, 1909, recorded June 3, 1909. At the same time, by separate deeds of trust also dated May 26, 1909, and also recorded June 3, 1909, Gresham and Paschall separately conveyed the specific lots, which had been simultaneously conveyed to them by the Land Company, to trustees to secure two debts identical in amount ($10,000.00 each) to the Land Company.

It appears, therefore, that these conveyances were then accepted by all of those then interested therein as closing the original contract of sale, and as vesting Gresham and Paschall each with the legal title to the specific lots so conveyed to them in severalty.

The decree seems to be based upon the erroneous assumption that Gresham and Paschall, before the conveyances to them, had become the joint equitable owners of the property under a completely executed contract on their part. The facts, however, are that the several deeds to Reed, to Paschall and to Gresham, and the two deeds of trust to secure the two personal debts of Gresham and Paschall to the Land Company must have been all made pursuant to previous or contemporaneous agreements, for they were all dated May 26, 1909, while the original contract was still executory, because it is also shown that the balance of the purchase money was not paid until June 3, 1909, so that these deeds were apparently interdependent. Certainly they clearly show the changes which were made in the original contract before it became executed. They demonstrate the

fact that the payment of the purchase money June 3, 1909, and the delivery of the several conveyances were simultaneous, for all of these deeds were recorded June 3, 1909, the date when the contract as theretofore changed first became executed.

Both Gresham and Paschall built expensive dwellings on their respective lots, facing each other on Seminary avenue at Melrose. We are here concerned chiefly with the three lots conveyed to Gresham, 1, 2 and 3. He built upon and occupied the premises as his residence until July, 1918—say nine years. He then sold the property to John M. Miller, Jr., the appellant, who occupied it until he entered into the contract with George S. Kemp, the appellee, February 28, 1929.

The deed dated May 26, 1909, recorded June 3, 1909, from the Land Company to Gresham, which is signed by Paschall and his wife, as parties of the third part, but is not acknowledged by them, contains this language: "And the said parties of the third part sign and seal this deed for the express purpose of waiving any and all rights and claims that they have, or may have, under a certain written contract with the party of the first part affecting the said three lots hereby conveyed and of consenting to the conveyance of said three lots to said Thomas Gresham."

Upon these words and the failure of Paschall and wife to acknowledge the deed for recordation rests the contention that Miller cannot now convey a good title to Kemp. It is held by the trial court that Paschall then had a complete equitable title to an undivided one-half interest in the lots 1, 2 and 3, so conveyed by the Land Company with Paschall's approval to Gresham, the consequence of all which is the holding that a number of judgments against Paschall, aggregating approximately $250,000.00, all of which were recovered during the period 1921 to 1926, more than ten years after the conveyance to Gresham and long after Gresham's conveyance to Miller are adjudged to be liens on an un-

divided one-half of the lots of Miller, and to relieve Kemp of all of his obligations under his contract with Miller to buy the property.

Certainly it may be confidently said that but for the clause quoted Miller's title as an innocent purchaser for value without notice could not have been questioned. It is also true that the insertion of the clause of itself created no new or additional right in Paschall. The only effect of the clause, then, was to supply notice of a pre-existing contract, while its avowed purpose was to assure Gresham that all such rights as might have previously existed, or might have arisen thereunder, had been abrogated—satisfied. It clearly was not notice of any possible adverse claim of Paschall.

In holding that these contingent rights in this unperformed executory contract could not, while it was still executory, be waived by parol, the clear distinction between a complete equitable title in land and a mere equitable right or interest in such an executory contract is disregarded. An interest in an unperformed executory contract for the sale of land may be waived by parol. The contention which the trial court sustained is that this was a contract already executed before the date when the transaction was closed by payment of the purchase money and the delivery of the deed to Gresham, but the evidence and the several deeds dated May 26, 1909, recorded June 3, 1909, show the contrary.

All save one of the cases cited and relied on to sustain the decree relate to the liens of judgments against the former holder of the legal title to land whose vendee had failed to record his deed before these judgments became liens. They are inapplicable here because Paschall never was the holder of the legal title to the Gresham lots. The exception is the case of *Flanary* v. *Kane*, 102 Va. 547, 46 S. E. 312, 681. Fourteen separate parcels of land, of which Barron had held the legal title to all but one, and a large

number of judgments against Barron were involved. The statement of facts is confusing, the printed record equally so, and both are difficult to comprehend. Most of the printed record as well as the opinion relate directly to liens on lands of which the judgment debtor was held to have the legal title, and have no reference to equitable titles. This much is here applicable: Barron, against whom there were then judgments duly docketed, became the equitable owner of one of these tracts, referred to as the "Hall" tract. He was held to have purchased and fully paid for it. At his direction his vendor conveyed the "Hall" tract to Slemp (also bound by some of the judgments). No one in that case questioned the validity of this deed to Slemp, or that it was fully effective to extinguish Barron's title. It was treated so far as it affected the judgment liens just as Barron's deeds transferring lands to which he had legal title were treated. This deed to Slemp disclosed the fact that Barron's vendor (Hyatt) conveyed the "Hall" tract to Slemp "at the instance of Barron." This was construed to be sufficient notice to Slemp and his assignees of Barron's complete equitable title, and the judgments against Barron docketed previous to the recordation of Hyatt's conveyance to Slemp were held to be liens on the "Hall" land. The authority for this statement is syllabus two, which reads:

"Where the recitals of a deed under which a purchaser claims show that a third person was formerly the equitable owner of the land, such purchaser is charged with notice of that fact, and the land is bound in his hands for prior judgments against such equitable owner which have been duly docketed."

We do not find, either in the opinion or in the printed record which was before this court, this precise adjudication or expression, but the language is that of the learned reporter of the court (Hon. Martin P. Burks), whose ability and carefulness are conceded by all, and is so significant that we

think it must have been made with the approval of the court. We shall, therefore, assume that he had access to other parts of the record which justified the statement. In addition to this, we are in full accord with it, as a proper statement of the rule applicable under such circumstances.

That case, then, differs from this in that here it is clearly shown that there were no judgments against Paschall at the time of the recordation of the conveyance to Gresham, so that he then took the title of the Land Company, which no judgment recovered against Paschall since that conveyance was recorded can possibly affect.

The lien of a judgment reaches far. It reaches every interest of the judgment debtor in land which the record of the title shows that he had, either before or after the judgment was docketed, even though he has in fact transferred his interest to an innocent purchaser before the judgment was docketed, unless the record itself shows such previous transfer by deed duly recorded. It is always, however, necessary to show the judgment debtor's present or former title to the specific land before the lien attaches. .

The lien of the judgments against Paschall are not liens upon the land which Miller agreed to sell to Kemp, because it is so clearly shown by the record chain of title that Paschall never had or became possessed of or entitled to it at any time either before or after the judgments which under Code, section 6470, is essential before the lien can attach.

By its express terms this contract was in its inception executory. It could not become an executed contract until the purchase price had been paid and the owner, the Land Company, had delivered its deed conveying the lots.

The great Chief Justice (Marshall), in *Fletcher* v. *Peck*, 6 Cranch 136, 3 L. Ed. 178, in deciding that a grant from the Governor, by authority of the legislature of Georgia, was an executed contract, had the distinction in mind when he said,

"a contract is a compact between two or more parties, and is either executory or executed. An executory contract is one in which a party binds himself to do, or not to do, a particular thing; such was the law under which the conveyance was made by the Governor. A contract executed is one in which the object of the contract is performed; and this, says Blackstone, differs nothing from a grant. The contract between Georgia and the purchaser was executed by the grant." 6 R. C. L., section 9, page 590.

The later cases have reiterated this definition. *Cross* v. *Buskirk-Rutledge Lumber Co.*, 139 Tenn. 79, 201 S. W. 141, Ann. Cas. 1918D, 983; *Westchester F. Ins. Co.* v. *Robinson*, (Tex. Civ. App.), 192 S. W. 793.

In *Farrington* v. *Tennessee*, 5 Otto (95 U. S.) 679, 683, 24 L. Ed. 559, it is said in distinguishing between executed and executory contracts: "A contract is executed where everything that was to be done is done, and nothing remains to be done. A grant actually made is within this category."

The expression (Pomeroy's Eq. Jur. [3d ed.], section 368) referred to in *Sale* v. *Swann*, 138 Va. 208, 120 S. E. 870, is used in connection with controversies solely between vendor and purchaser of land and their equitable rights under such contracts, but in the absence of any element of mistake or fraud such partly executed contracts have slight relation to the rights of others.

In equity the vendee owns the land and the vendor is entitled to the purchase money, but this is an equitable doctrine and cannot be invoked as conclusively determining all legal rights and liens of others. That this is true is apparent, for judgments against the vendor docketed before his conveyance to the vendee is recorded continue to be liens upon the land.

The fundamental error of the trial court is in the holding that all the attributes and consequences which would have followed had the legal title to the land been

actually conveyed to Gresham and Paschall jointly, attached immediately and irrevocably to the equitable rights created by the original contract. It may be that an equitable title which is disclosed in the chain of title by the record can only be conveyed by deed duly recorded but this is not true of mere equitable rights under unexecuted contracts not so disclosed. Certainly the Land Company might have defeated all these rights by a breach of contract, by conveying the land to an innocent purchaser. It is also certainly true that the original parties had the right and power to rescind, abrogate, amend, or change, the contract by parol (subject to the rights of third parties), and for this there is ample authority.

That an unexecuted written contract for the sale of land may be rescinded by a subsequent parol agreement is held in *Phelps* v. *Seely*, 22 Gratt. (63 Va.) 573, and the holding is supported by English and American cases. This is admitted by the learned counsel for the appellee and cannot be questioned.

In *Jordan* v. *Katz*, 89 Va. 628, 16 S. E. 866, it is said that a contract creating an equitable interest in land may be rescinded, waived, or abandoned, by a subsequent distinct and independent parol agreement between the parties, partially acted on or fully performed by them.

In the recent case of *Colvin* v. *Butler*, 150 Va. 672, 143 S. E. 333, some of the cases showing that such a contract in writing may be revoked by parol are cited and approved. Surely it follows that it may be amended and modified before it becomes executed, by parol, by vendor and purchasers so as to substitute ownership in severalty by each for joint ownership by both.

Observe also, that even if it could be said that Paschall ever had any title to the Gresham lots, clearly he should be held in equity to have held them as trustee for the beneficial owner—now Miller. Such a title could not be

subjected to judgment liens against the trustee, Paschall. *Coldiron* v. *Asheville Shoe Co.*, 93 Va. 364, 25 S. E. 238. So too, in *Dingus* v. *Mining Imp. Co.*, 98 Va. 737, 37 S. E. 353, judgments against the holder of the bare legal title were held to be unenforceable because the land was charged with a paramount trust.

This expression of Staples, J., in *Floyd, Trustee,* v. *Harding*, 28 Gratt. (69 Va.) 407, has been often quoted: "It has been over and over again decided that the judgment creditor can acquire no better right to the estate than the debtor himself has when the judgment is recovered. He takes it subject to every liability under which the debtor held it, and subject to all the equities which exist at the time in favor of third persons; and a court of chancery will limit the lien of the judgment to the actual interest which the debtor has in the estate." *Van Nostrand* v. *Va. Zinc & C. Corporation*, 126 Va. 139, 101 S. E. 65.

Of course, this is qualified by the recording statutes, and no title which is disclosed by the recorded chain of title can be divested by mere disclaimer, but it remains nevertheless true that before the lien of the judgment can attach, the judgment debtor must own, or have owned, some beneficial interest in the specific land involved. Here he (Paschall) only had an expectancy which was completely satisfied by the conveyance directly to him of the most valuable of the lots (priced in the contract at $2,950.60) included in the original contract. He never acquired any legal or equitable title, as distinguished from an equitable claim, to the Gresham lots for such title depended upon future contingencies and agreements.

The discussion of the case has become involved and be-clouded by reference to other well-established equitable rules, which under the facts here shown are inapplicable. These rules were conceived for the purpose of ameliorating the rigors of the common law, and only for the correction of

wrongs.  They were never intended to sanction injustice or to nullify any clear legal title except when necessary for the correction of some injustice.  So to apply an equitable rule as to deprive one of his land who has paid for and has acquired the legal title to it, for the benefit of others, would be to disregard the sole and fundamental reason for such equitable intervention (*i.e.*, for the correction of wrongs) and to enforce that rule for the consummation of a wrong.

Gresham and wife also signed the deed from the Land Company to Paschall as parties of the third part, the identical language being used in both deeds, and it is here emphasized in argument for the appellee that these deeds were for the purpose of making partition between Gresham and Paschall of realty which is assumed to have been already their own joint property, and that as they were neither acknowledged nor recorded as to Paschall and Gresham, they are ineffective to extinguish their equity because of the recording statutes.  Before partition, however, there must be joint ownership, and here there never was any such joint ownership, for the legal and beneficial title both passed directly from the Land Company to Gresham.  Certainly the language used neither imports nor suggests partition.  On the contrary, it appears to be as to each of them only a disclaimer or waiver which could have been made verbally.  The Land Company alone conveys or grants, Paschall and Gresham merely disclaim and acquiesce.  In our opinion, the two deeds, one to Gresham (here involved), the other to Paschall, must necessarily be construed to be the conclusive evidence of a previous modification of the original contract before it became executed by either, made by consent of all those having the slightest interest in the land, of which modification, consent and consummation the signatures to the deeds are the incontestable and sure evidence.

Suppose, however, it could be construed to be a partition, how did this injure any creditor of either Gresham or Paschall?

The case of *Bryan* v. *Stump*, 8 Gratt. (49 Va.) 246, 56 Am. Dec. 139, demonstrates the radical difference between deeds of partition and conveyances of land. The land had been inherited by Thomas Cresap and his sister Abigail, who married James Cresap. There was a deed of partition between Thomas Cresap and his sister Abigail. The deed was signed by Thomas and his wife, Mary, and by James Cresap and his wife, Abigail. There was, however, no privy examination of either Mary or Abigail which was at that time essential to the validity of every conveyance of land by a husband and wife. Nevertheless the court held the deed of partition effectual. This must have been because it was not in its effect either a conveyance of land or a transfer of any interest theretofore owned by either, but merely an agreement or covenant to hold the property thereafter in severalty, rather than jointly. The statute, Code, section 5141, now prohibits coparceners from making voluntary partition except by deed. It cannot be said that to be effective any partition deed (in the absence of fraud) can be questioned, or that their validity as to creditors depends upon recordation under Code, section 5194; this because the rights of creditors are not thereby injuriously affected. The property of their debtor is neither conveyed nor diminished by a fair partition. The deed is good between the parties and in the absence of fraud is a mutual covenant in which parties thereto are alone interested. In the instances in which they may possibly be successfully attacked, the relief to be afforded in good conscience can only be to cancel the deed and to restore the former joint ownership. Here, the effect of the decree of the trial court is to cancel the alleged partition only so far as it affected Gresham's share but to leave it unaffected and effective as to Paschall's share. He and his estate have had and disposed of his share, but it is held, nevertheless, that Paschall's creditors may now take one-half of Gresham's share. The partition, so-called, was valid

as between the parties, and the liens of judgments against either, whether before or after partition, could only attach to the interest or estate of the judgment debtor.

The principle property applicable under the conceded facts is expressed by this concise but comprehensive statement from 27 R. C. L. 529: "As a general rule evidence of contemporaneous or antecedent agreements between parties is inadmissible to vary or contradict the terms of a deed. And where an executory contract is carried out by a conveyance which is accepted by the purchaser, this, in the absence of fraud, accident or mistake, operates as a satisfaction and discharge of the executory contract and regulates the rights and liabilities of the parties; and if the deed is tendered by the vendor as a full performance of the contract, it is immaterial that the purchaser protested against accepting it as such. This is so though the deed thus accepted varies from that stipulated for in the contract. And though the lands embraced in the deed are not the identical lands described in the agreement, yet in the absence of evidence of mistake, misrepresentation, or fraud, if the purchaser accepts the conveyance, the agreement to convey is discharged."

All this being certainly true, it should be held to be conclusive of this case.

The precedents supporting this rule are many. They are cited in the note to the paragraph quoted. Among them are two Virginia cases:

In *Trout* v. *Norfolk & W. R. Co.*, 107 Va. 576, 59 S. E. 394, 17 L. R. A. (N. S.) 702, the deed was held to be the final and exclusive evidence of the contract between the parties, and testimony as to previous understandings and agreements was excluded.

In *Snyder* v. *Grandstaff*, 96 Va. 480, 31 S. E. 647, 649, 70 Am. St. Rep. 863, it was sought to charge the grantee in a deed with notice of a preliminary contract which would have shown that a mistake had been made in a deed in the re-

corded chain of title, and as to this the court said: "But suppose she did know of it, that every provision in it was known to her, this does not prove that she did know the deed did not express the final and true agreement between the parties. On the contrary, she would have the right to presume that the purposes of the parties were altered, if there was conflict between the agreement and the deed. In *Donaldson v. Levine*, 93 Va. 472, 25 S. E. 541, the court says: 'The burden is throughout on the complainant who must rebut the presumption that the writing speaks the final agreement by the clearest and most satisfactory evidence. It must not only appear that the parties entertained a different intention in the first instance, but that it was not changed at or before the execution of the instrument; for otherwise the legal and natural inference is, it was laid aside for that expressed in the writing.' Why should any one be required to look behind the recorded title and run down the preliminary contracts to discover that the parties to a solemn deed have made a mistake?"

There is a comprehensive note on the subject in *Clifton v. Jackson Iron Co.* (74 Mich. 183, 41 N. W. 891), 16 Am. St. Rep. 622. It is there said that the rule is generally recognized and almost universally applied, that all articles of agreement for the sale of land are merged in and extinguished by a subsequent deed therefor between the parties. "Such a deed, when delivered and accepted, is deemed, in the absence of fraud and mistake, to express the final and entire contract between the parties, and any inconsistencies between the original contract of sale and the subsequent deed are in general, to be explained by the latter. *Jones v. Wood*, 16 Pa. 25; *Carter v. Beck*, 40 Ala. 599; *Davenport v. Whisler*, 46 Ia. 287; *Frederick v. Youngblood*, 19 Ala. 680 [54 Am. Dec. 209]; *Davis v. Clark*, 47 N. J. L. 338 [1 A. 239]; *Houghtaling v. Lewis*, 10 Johns. [N. Y.] 297; *Williams v. Hathaway*, 19 Pick. [Mass.] 387; *Gibson v. Richart*, 83 Ind.

313-315. Mr. Rawle, in the fourth edition of his treatise on covenants for title, at page 566, lays down the rule thus: 'But when the contract has been consummated by the execution and delivery of the deed, a different rule comes in. Being thus consummated, any inconsistencies between the terms of the contract and the terms of the deed are, in general, to be governed solely by the latter, into which the former are merged; and the purchaser's only right to relief from defects and encumbrances whether at law or in equity, depends, in the absence of fraud, solely upon the covenants for title which he has received.' Although the learned author, in thus stating the doctrine, speaks only of the purchaser, we apprehend that the rule applies with equal force to the vendor."

The learned author of that note, Mr. Freeman, repeats that rule in his note to *Slocum* v. *Bracy* (55 Minn. 249, 56 N. W. 826) 43 Am. St. Rep. 501, with this conclusion and these citations: "The general rule is that all articles of agreement for the sale of land are merged in and extinguished by a subsequent deed thereof between the parties. The agreement becomes a nullity, and the rights of the parties are controlled by the deed. * * * *Kerr* v. *Calvit*, Walker [Miss.] 115, 12 Am. Dec. 537; *Hunt v. Amidon*, 4 Hill [N. Y.] 345, 40 Am. Dec. 283; *Timms* v. *Shannon*, 19 Md. 296, 81 Am. Dec. 632."

The rule is recognized in *Blake-McFall Co.* v. *Wilson*, 98 Oregon 626, 193 Pac. 902, 907, 14 A. L. R. 1284, in this language: "Stated broadly, the general rule is that a contract to convey land is merged in a deed executed in performance of such a contract and the deed operates as a satisfaction and discharge of the executory contract. 2 Devlin on Real Estate (3d ed.), section 850-a; 27 R. C. L. 529. There is a class of cases, however, where it is held that, if the preliminary contract contains a stipulation of which the conveyance is not a performance, such stipulation sur-

vives and is not merged in the deed. 27 R. C. L. 532; 2 Devlin on Real Estate (3d ed.), section 850-b. In other words, the deed effects a merger to the extent that it is contemplated that a deed shall be a performance of the contract."

In that case, the stipulation in the contract which is referred to was that an elevator in a building should not pass by the deed, and it was held that it did not pass, though this express reservation was omitted from the deed subsequently executed. The same principle is stated in *Loftis* v. *Clay*, 164 Ga. 845, 139 S. E. 668.

So far as we know, the case of *Acer* v. *Westcott* (46 N. Y. 384), 7 Am. Rep. 355, has never been questioned. There it appeared that Charlotte H. Brown, prior to June 3, 1867, entered into an agreement with Ezra W. Acer for the sale of real estate. Thereafter Acer negotiated with George G. Curtis, to whom he assigned his rights under the contract of sale, providing therein that Curtis should execute to him (Acer) a mortgage for $3,380.20 upon the premises when conveyed to him. Then, June 3, 1867, the vendor, Brown, conveyed the premises to Curtis, Acer's assignee, by a deed containing the usual covenants of warranty, and this recital: "This conveyance is made in pursuance of a contract of sale of said premises made and entered into by the party of the first part, for a conveyance thereof to one Ezra W. Acer, of whom the said party of the second part has become the assignee or purchaser; and as such entitled to a fulfillment thereof, by virtue of this conveyance; said contract being dated January 29, 1864." The deed was delivered to and recorded by Curtis, and on the same day he executed to one Westcott a mortgage upon the premises for $6,000.00. The trial court held that the recital in the deed was constructive notice of Acer's equity, and that he had a lien upon the premises for $3,280.20 superior to Westcott's mortgage. Upon appeal this judgment was reversed. The opinion cites

many cases and quotes this language from Chancellor Sir James Wigram in *West* v. *Reid*, 2 Hare 260: "Let the doctrine of constructive notice be extended to all cases (it is in fact more confined). Let it be extended to all cases in which the purchaser has notice that the property is affected, or has notice of facts raising a presumption that it is so, and the doctrine is reasonable, though it may sometimes operate with severity. But once transgress the limit which that statement of the rule imposes; once admit that a purchaser is to be affected with constructive notice of the contents of instruments not necessary to, nor presumptively connected with, the title, only because by possibility they may affect it, and it is impossible to stop short of the conclusion that every purchaser is affected with notice of the contents of every instrument, of the mere existence of which he has notice."

And then the opinion continues: "The purchaser must be presumed to investigate the title, and to examine every deed or instrument forming a part of it, especially if recorded. In all the cases referred to, where recitals have been held to be constructive notice of the defect or of the equity, the recital itself directly referred to the defect. That is, it referred to a title as conveyed by an executor or administrator, or by a widow or her second husband, when the title was in the first, or by a guardian, etc. In all cases, other than conveyances or assignments by parties themselves competent to assign, the purchaser is bound to see that the conveyances have been made according to law, so as to carry the title. Not so where the recital states nothing to arrest the attention or arouse the suspicion of a person of ordinary care, as that the conveyance is made pursuant to a contract with the vendor, or with Mr. Acer, the assignor of the vendee, who assigned the contract to him, and he is entitled to a deed in fulfillment thereof. The parties being all competent to convey, no constructive notice of Acer's equity is found there."

■■ So in this case, there is nothing in the covenant by Paschall in the deed to Gresham to give Miller any constructive notice that there was the slightest defect in the title which the Land Company conveyed to Gresham, and which Gresham, in turn, conveyed to Miller.

The very fact that the final instrument of conveyance, the deed, differs from the original contract and was accepted by both Gresham and Paschall is evidence of a change in their original agreement. In this case the proofs of the change, which might have been made by parol, are in writing, so conclusive as to estop all the parties to the transaction from denying that controlling fact, and no one else at that time had any legal title or equitable interest in the land. When the Land Company conveyed to Gresham and to Paschall in severalty, simultaneously with the payment of the balance of the purchase price, with their approval and consent, the original contract was fully and finally satisfied—consummated. When Gresham, nine years thereafter, July 2, 1918, conveyed to Miller his (Gresham's) record title was complete, this title having been conveyed to him by the Land Company in 1909.

The entire case here for the purchaser, Kemp, is based upon the contention (which is not only unsupported by the evidence but is disproved) that Paschall owned an undivided one-half of the lot which was conveyed to Gresham, but this did not appear from the record, and surely it is unnecessary to transfer by deed under the recording act any equitable right not disclosed by the record. This is, as we have said, the fundamental error in the decree. Had Paschall objected to the settlement and discharge of the contract, he could then have asserted any right claimed by him against the Land Company, by suit in equity for specific performance, or had the lot been wrongfully conveyed to an innocent purchaser, by action against the Land Company for breach of contract. Both of these possible rights were,

however, satisfied when he accepted the conveyance of the most valuable of the lots to himself in severalty, and consented to the conveyance of three of the other lots (here involved) to Gresham. Under the facts shown when the lots had been fully paid for under the contract as modified, he had no further interest at law or in equity in the Gresham lots which Gresham unequivocally testifies he had paid for, nor did he (Paschall), then or since, claim any such interest, nor did he undertake to convey any such interest. The language of the deed expresses this and the contemporaneous and subsequent conduct of all the parties confirms this result. The Land Company was the sole owner of the legal title, and that title was conveyed by it directly to Gresham. Paschall signed the deed, not as a grantor, but for the purpose of supplying written and certain evidence that by agreement of all three of the parties the original contract had been modified, and that he "waived" any right he might have otherwise had and consented to the conveyance to Gresham, and therefore he disclaimed any possible equitable right he might under different circumstances have had under that original executory contract had it not been so modified before the payment of the purchase money and before its execution by the Land Company.

Suppose that at the time of the deed to Gresham, instead of acquiescing in that conveyance, he had asserted in a court of equity what is now here claimed, namely, that he was then vested with a perfect equitable title to an undivided one-half of the Gresham lot, which could only be divested by deed duly acknowledged and recorded, can there be any doubt, under the facts then existing and now shown, that his bill would have been dismissed? Had he claimed that the Land Company then held an undivided one-half interest in the lots claimed by Gresham, as his trustee, and it had been also shown that Gresham had paid for these lots, but that he (Paschall) nevertheless also claimed the other lot which

at his request had been or was about to be conveyed to him, certainly it is obvious that his claim would have been denied, because the evidence would have demonstrated that Gresham had paid for and hence was the equitable owner of the lots which he claimed, and that every legal or equitable right of Paschall under the original contract as modified had been satisfied by the conveyance to him in severalty of the lot claimed and paid for by him under the contract.

That the Land Company construed the two deeds to Gresham and Paschall as its own execution of the contract and as the fulfillment of all of its own obligations under the contract so modified, is evident, because it simultaneously treated each of them as the sole owners of the respective lots which were then so conveyed in severalty; loaned to each the sum of $10,000.00, and took separate deeds of trust from each on the same lots as security. The contention now made contradicts the construction put upon these deeds by all of the parties thereto and then alone interested therein, made more than twenty years ago, upon the faith of which they and all others have since acted.

When Miller purchased from Gresham, nine years after the conveyance to him, so far from having notice that there was an outstanding equitable title to one-half of the lots still in Paschall, he was assured by the deeds on record that whatever claim Paschall might have originally had either against the Land Company or Gresham under this unrecorded contract had been fully satisfied, for Paschall's deed showed that with his (Paschall's) assent the legal title had been conveyed by the Land Company to Gresham. Any other construction of this deed would contradict its plain import. The construction contended for by the appellees is inconsistent with its language and evident purpose. Miller has and can convey a title which is free from valid objection, and the court erred in dismissing the original bill.

The legal lien of a judgment against the holder of

the beneficial or legal title, as disclosed by the record chain of title, is superior to the equities of third persons, and will always be respected and enforced. When, however, it is claimed that a judgment creditor has a legal lien upon land held by an equitable title (a creation of the courts of equity), not disclosed by the record title, then the claimant of the lien by judgment must seek the aid of a court of equity to uncover the equitable title. In that forum he must abide the rules of equity, and can only have his legal lien enforced if there be no superior equities. To these he must always yield.

The decree will therefore be reversed and the cause remanded, with directions to enter such decrees as may be necessary to enforce specific performance of the contract of sale between John M. Miller, Jr., and George S. Kemp in accordance with the prayer of the bill.

*Reversed and remanded.*

HOLT, J., dissenting:

Mr. George S. Kemp submitted to Mr. John M. Miller an offer to purchase the Miller home in Ginter Park, Richmond, "provided the title is free from valid objections." This offer Mr. Miller accepted. Title tendered was not acceptable, hence this suit.

The court, in its opinion, has stated the facts rather fully, but a restatement of some of those deemed most pertinent is in order, for on the facts most cases are won and lost, though able counsel can sometimes make that which is simple as elusive as the fourth dimension.

Thomas Gresham and J. R. Paschall at one time lived in North Carolina, and were associated there in many joint enterprises. Afterwards, for satisfactory reasons, they moved to Richmond and built for themselves homes in that city.

Naturally the question of location had to be settled.

Ginter Park appealed to them, and so by contract of date September 23, 1907, entered into by the Lewis Ginter Land and Improvement Company, party of the first part, and Thomas Gresham and J. E. Paschall, parties of the second part, these gentlemen undertook to purchase, and did purchase, from this land company, lots 2, 3, 4, 5 and 6, in block G, and lot 13, in block F, as appeared upon a recorded plat of that company's land. The contract price was $10,451.60, of which $1,045.16 was paid in cash and the residue was to be paid in five equal annual instalments.

Afterwards lot 1 in block G was substituted for lot 6. This substitution was authorized by this memorandum: "It is understood and agreed that the within contract is hereby modified and altered by substituting lot No. one (1), in block G, in Ginter Park, in the place and stead of lot No. six (6) in said block G, the said lot No. one (1) having been conveyed by Charles G. Taylor to Thomas Gresham, by said Thomas Gresham and wife, by their deed of even date herewith, to 'Lewis Ginter Land and Improvement Company, and, in consideration thereof and at the request of said Thomas Gresham, the said lot No. six (6), in block G, having been conveyed to said Charles G. Taylor by said Lewis Ginter Land and Improvement Company by its deed of even date herewith.'

"Witness the following signatures and seals this 8th day of November 1907.

> "Lewis Ginter Land and Improvement Co.,
> "By Thomas F. Jeffress, *President.*
> "Thomas Gresham          (Seal)
> "J. R. Paschall          (Seal)."

Up to this point it is perfectly clear upon the face of the record that Gresham and Paschall were joint purchasers, and this is emphasized by the fact that the consent of both of them was deemed necessary when lot 6 was exchanged for lot 1.

But it is said that things are not always what they seem, and that "the evidence in this case and all the acts of the said Gresham and Paschall conclusively show that in the inception of the transaction the said Gresham and Paschall had an oral agreement or understanding in effect that each should purchase and hold in severalty the respective lots upon which each was to construct a residence as a home for himself and family; the said Gresham to have the lots on the east side of Seminary avenue, and the said Paschall to have the lots on the western side of Seminary avenue.

"Each paid for his land, each party contracted for the construction of his dwelling, each party paid for the construction of his dwelling, and the Lewis Ginter Land and Improvement Company conveyed to Thomas Gresham his property, and conveyed to J. R. Paschall his property in accordance with the said oral agreement or understanding between said Gresham and Paschall. They took separate deeds, and gave separate deeds of trust, securing the money each borrowed for the purpose of paying their construction costs.

"No transaction could be plainer or more natural, and the acts of the parties is conclusive of the facts stated.

"Neither ever had any beneficial interest in the lots built upon by the other." Miller's petition for writ of error.

Again he said: "In the instant case (*Miller* v. *Kemp*), Paschall waived any rights or claims under a contract with the Lewis Ginter Land and Improvement Company, and consented to the conveyance of the lots 1, 2 and 3 in block G, to Gresham. And likewise, Gresham waived any rights or claims under the contract, and consented to the conveyance to Paschall of lot 13 in block F. It is conceded that Paschall had substantial rights in said contract, as did Gresham. *But it is insisted that,* as to lots 1, 2 and 3, block G, Paschall had no beneficial interest, and as to lot 13 in block F, Gresham had no beneficial interest. If either had

had an equitable title in the land conveyed to the other, *it is unreasonable to suppose that he would have waived it.* The two deeds read together conclusively show that neither claimed any right in the home site of the other. The language does not assert an interest, but expressly waives any right to the other's home site." (Italics supplied.)

It is insisted that Paschall had no interest in the Gresham lots. On this rock the plaintiff builds his case.

It may be said in passing that counsel for plaintiff, lacking neither in ability nor in numbers, have only by remotest implication touched upon the doctrine enunciated in *Phelps* v. *Seely,* 22 Gratt. (63 Va.) 573, so heavily leant upon by the court in its opinion.

"Where a party gives a reason for his conduct and decision touching anything involved in the controversy, he cannot, after litigation has begun, change his ground and put his conduct upon another and different consideration. He is estopped from doing it by a settled principle of law." *Railway Co.* v. *McCarthy,* 96 U. S. 258, 267, 24 L. Ed. 693; *Goodman* v. *Purnell* (C. C. A.), 187 Fed. 90; *Oakland, etc., Co.* v. *Wolf Co.* (C. C. A.), 118 Fed. 239; *Heckscher* v. *Blanton,* 111 Va. 648, 653, 69 S. E. 1045, 37 L. R. A. (N. S.) 923; *Arwood* v. *Hill's Adm'r,* 135 Va. 235, 243; 117 S. E. 603; *Robinson* v. *Shepherd,* 137 Va. 687, 120 S. E. 265; *Nagle* v. *Syer,* 150 Va. 508, 143 S. E. 690.

Subsequent conduct of Paschall and Gresham demonstrates beyond peradventure that Miller's claim, so vigorously "insisted upon," is not sustained by the facts.

By deed of date May 17, 1909, recorded on June 3rd, following, Jennie L. Reed took title to lots 4 and 5 in block G. In it the Land Company appears as party of the first part and Gresham and wife and Paschall and wife as parties of the second part. Had Gresham bought some of these lots and Paschall others, then it would not have been necessary for them both to unite in this deed unless it

chanced that one owned lot 4 and the other lot 5, but that remote possibility disappears when we find that the sum realized from this sale was applied on the joint indebtedness of these purchasers. In other words, the proceeds of this sale was theirs jointly, and it was applied on their joint debt and went neither to Paschall nor to Gresham.

Plaintiff, who now so confidently asserts that there was never any joint purchase, did not at first know where to rest his case. He contended that it was a partnership transaction. That position was later deemed untenable and abandoned, and did not proceed far enough to involve any principles of estoppel, but it is the antithesis of an undertaking individual in its inception. Now, not only is the idea of a partnership repudiated, but it is said that these purchasers never had any common interest in the lots. Of course, it is possible that Mr. Gresham was not consulted in advance, but it is not probable, and this suggestion of a partnership must have had its origin in some conference with him. The claim afterwards stressed, namely, that these were individual transactions and not joint, was then many miles away.

Mr. Gresham's testimony itself, while frank, is certainly indefinite. If plaintiff is to prevail it must be extremely definite. On direct examination he said:

"Q. My question was, how was the initial payment made, individually or with partnership funds?

"A. I paid for mine and he paid for his.

"Q. Do you mean you put up your money, or was it done with the partnership funds?

"A. I can't say whether it was my own money or partnership funds. If it was put up from partnership funds, my amount was charged to me and his amount to him. It was not a partnership purchase. I purchased land for my home and he did for his. Whether we did it jointly or whether they required us to do it jointly, I don't remember at this

time, but the result of the purchase was that we bought more land than we needed because we had an intimation that we could trade off what we didn't want and get what we did want. We made some little changes with Mr. Pollard and we got opposite each other, what we did want, I buying on one side of the road and he on the other side."

And again:

"Q. Do I understand then that originally you all bought this land together and then determined to have certain lots conveyed to you and certain conveyed to Mr. Paschall?

"A. Yes, sir. We bought them under a tentative arrangement by which, by buying these lots, we could shift around with the other people we traded with, Mr. Pollard and I think Mr. Taylor, and finally get each a corner lot as we wanted them."

Certainly there is nothing in this which can do away with record evidence of a joint transaction.

That these purchasers did from the beginning intend at some time to partition these lots, or such of them as remained unsold on final adjustment, is doubtless true, but it is equally true that there was no understanding as to the exact methods of partition to be followed, and it is certainly true that there was no agreement to the effect that one lot belonged to Gresham and another to Paschall.

If, pending final settlement, an offer of purchase had been made so advantageous as to induce acceptance, dealings theretofore had make it plain that any sum so realized would have been divided between these purchasers, and that Paschall would not have taken what was realized from one lot and Gresham what came from another.

The character of their purchase was recognized by them up to the very end of their dealings with the Land Company. As we have seen, final payment was a joint payment and of course the Land Company delivered no deed until it was made, although in anticipation of final payment the deed

had been already written. That this was a joint purchase, it is with deference submitted, is too plain for argument. When the land was paid for Paschall and Gresham were its joint equitable owners. They had done all that they were to do and as to them the contract was executed, but whether we term it executed or executory, it was paid for and paid for in the character in which it was purchased. Final payment vested in Paschall and Gresham a complete equitable title, and such an estate, so far as the rights of creditors and the liens of judgments are concerned, is as complete as it would have been had a deed been made to those gentlemen.

Plaintiff's major contention in the court below was that there was some implied or constructive trust. Of course, if Gresham's money went to pay for lots to which Paschall had taken title, Paschall would have held in trust for Gresham, but, as we have seen, Miller makes no such claim in his petition for a writ of error, but asserts that Paschall's money paid for Paschall's lot and Gresham's money paid for Gresham's lot, and so the trust sought to be established vanishes away. If it were still a possibility, proof would have to be cogent and is not.

"It is settled by a complete unanimity of decision that such evidence must be clear, strong, unequivocal, unmistakable, and must establish the fact of the payment by the alleged beneficiaries beyond a doubt. Where the payment of a part only is claimed, the evidence must show, in the same clear manner, the exact portion of the whole price which was paid." 3 Pomeroy's Equity (3d ed.), section 1040; *Lee* v. *Elliott*, 113 Va. 618, 75 S. E. 146; *Hancock* v. *Talley* (Sp. Ct. of App.), 7 Va. Law Reg. 24.

By deed of date May 26, 1909, but not acknowledged and recorded until June 3, 1909, the date of final payment, this Land Company, party of the first part, conveyed with general warranty of title to Thomas Gresham, party of the second part, lots 1, 2 and 3 in block G. In it J. R. Paschall

and wife appear as parties of the third part. They sign and seal it but do not acknowledge it, and therefore, so far as they are concerned, it has never been recorded and cannot be recorded. The purpose of their presence is declared in the deed itself to be, "the said parties of the third part sign and seal this deed for the express purpose of waiving any and all rights and claims that they have or may have under a certain written contract with said party of the first part affecting the said three lots hereby conveyed and of consenting to the conveyance of said three lots to said Thomas Gresham."

This is the first intimation of record of any purpose on the part of the purchasers to partition among themselves those lots bought under the contract of September 23, 1907.

It seems plain that there was no intention to divide this property until it had been paid for as purchased. Otherwise final payment would not have been made by Gresham and Paschall jointly, but each of them would have paid what was then due upon his lots. Up to this point the character of the undertaking was unmistakable and these joint purchasers had a right to demand a joint deed. It was due to them and separate deeds could not have been made by the Land Company without the consent of the grantees. In other words, Paschall and Gresham bought and paid for this land in one capacity, and then, by mutual agreement, took deeds in another. It is true that they were delivered on the same day on which final payment was made, but the sequence of events preceding delivery are too compelling to be ignored.

Ordinarily, judgment creditors take only what the debtor has. "Authorities without number might be cited to show that where statutory enactments do not interfere the creditor can never get by his judgment more than his debtor really owns, and to this he will be confined, as he should be, by courts of equity." *Borst* v. *Nalle*, 28 Gratt.

(69 Va.) 423. The exception is as well established as the rule itself.

The deed to Gresham, in which Paschall united, was so far as Paschall is concerned either a deed or not a deed. If it is not a deed, it runs counter to Code, section 5141. If it is a deed, it cannot be recorded and is void as to lien creditors. Said Code section is applicable alike to equitable and legal estates, and must have in it the essentials of deeds in other cases. *Snyder* v. *Grandstaff*, 96 Va. 473, 483, 31 S. E. 647, 70 Am. St. Rep. 863. In the instant case we are not interested in the rights of Paschall and Gresham *inter sese*.

Judgments are liens on all real estate owned by the debtor. Acts of Assembly 1901–2, page 427; Michie's Code, section 6470.

Unrecorded deeds are void as to creditors. Code 1887, section 2465. By the Code of 1919, section 5194, they are void as to creditors, whether general or special, and by the amendment of 1922, Acts 1922, page 474, they are void as to lien creditors. These statutory provisions are plain and require no elaboration.

It is true that parties to a written contract creating an equitable interest in land may rescind, waive or abandon it while it is still executory. *Colvin* v. *Butler*, 150 Va. 672, 143 S. E. 333; *Jordan* v. *Katz*, 89 Va. 628, 16 S. E. 866; *Phelps* v. *Seely*, 22 Gratt. (63 Va.) 573. But when land has been fully paid for a complete equitable interest vests and cannot be divested by disclaimer any more than the holder of a legal title could divest himself by the destruction of his deed. Title to land from parties living passes by deed.

If it were conceded that this contract of purchase was executory when partition was made, and that this land had not then been fully paid for, it should not affect the result. Land which has been paid for in part may be partitioned just as if it had been paid for in full, and of course land

held under an equitable title may be partitioned just as is the case where legal title has vested.

In the instant case there was no waiver by either Paschall or Gresham, properly speaking, and to designate what was done as a waiver does not make it so. Their acts merely carried to consummation an inchoate purpose long entertained. In a manner of speaking, all deeds of partition have in them some of the elements of waiver. Each co-tenant renounces all interest in lands assigned to his associate in consideration of a corresponding renunciation on his part. Since joint tenants hold *per my et per tout*, their deeds of partition are not truly deeds of conveyance at all but deeds of release. 2 Minor's Inst. (3d ed.), page 496; Wythe (note), page 398. That is to say each joint tenant waives, relinquishes and renounces to his joint owner that portion of their property set apart to him. This was exactly what these joint tenants undertook to do in the instant case and was sufficient, had it been placed of record as was required by statute. If it had been acknowledged, it would stand recorded, but it was not and for that reason is void as to these judgment creditors.

Was Miller a purchaser for value without notice? It may be conceded that he had no actual notice, but the deed from his grantor had written in it a plain proclamation of Paschall's antecedent interest. The statement quoted indicated in unambiguous language that he had theretofore some claim of some character in it. With this danger signal up, inquiries should have been instituted. The nature of this claim and this defect in title could and should have been readily discovered. All of this was ignored by Miller, and this he did at his peril. *Jameson* v. *Rixey*, 94 Va. 342, 26 S. E. 861, 64 Am. St. Rep. 726; *Fulkerson* v. *Taylor*, 102 Va. 314, 46 S. E. 309; *Flanary* v. *Kane*, 102 Va. 547, 46 S. E. 312, 681; *Jackson* v. *Greenhow*, 155 Va. 758, 156 S. E. 377.

By way of recapitulation, it appears that Gresham and

Paschall were joint purchasers of this land and paid for it as such, and whether payment had been completed or not they could not partition it except by deed. They undertook to make partition by an instrument in writing which could not be recorded, and which is void as to those judgment creditors whose claims are asserted in this suit. Miller is charged with notice of defects in his title, and therefore is not a purchaser without notice.

On principle and authority I think the judgment below should be affirmed.

CAMPBELL, J., concurs in the dissenting opinion of HOLT, J.