PRESENT:  All the Justices

CPM VIRGINIA, LLC

                                                    OPINION BY

v.  Record No. 150278                JUSTICE D. ARTHUR KELSEY

                                           December 17, 2015

MJM GOLF, LLC

FROM THE CIRCUIT COURT OF THE CITY OF CHESAPEAKE
Randall D. Smith, Judge

The trial court found that CPM Virginia, LLC ("CPM") breached warranty provisions of a commercial contract involving the development and sale of a golf course.  CPM appeals on various grounds, including that the court misinterpreted the warranty provisions as a matter of law.  We agree, reverse the breach-of-warranty finding, and remand for further proceedings.

I.

Dominion Resources, Inc. operated an electric-generation power plant in the City of Chesapeake through its subsidiary, Virginia Electric & Power Company.  In 2002, Dominion agreed to provide fly ash, a residue generated by the coal-fired power plant, to CPM for use as fill material in a planned 18-hole golf course.  The agreement stipulated that the fly ash would be a non-hazardous substance under applicable federal, state, and local regulations.

In 2006, CPM entered into an agreement with MJM Golf, LLC ("MJM") titled "Golf Course Development Agreement and Contract for Sale & Purchase of Real Estate."  J.A. at 6.  Drafted by MJM's counsel, id. at 90, the agreement recited that CPM owned the property designated for the planned golf course, that Dominion had previously agreed to provide fly ash to use on the property, and that CPM had obtained a special-use permit for the development of the course.

In a paragraph titled "The Nature of the Transaction," the agreement stated that "CPM wishes to contract with MJM for MJM to construct the golf course pursuant to the previously issued conditional use permit" and that "MJM desires to develop and/or operate a golf course and is willing to do so subject to the terms and conditions imposed upon CPM to develop the said golf course, thereby satisfying the various commitments made by CPM." Id. at 7. MJM would also purchase the property from CPM and receive fee-simple title at closing. The purchase price of $700,000 would be financed by CPM through a promissory note executed by MJM that called for payment in full on January 1, 2013.

Article VIII of the agreement was titled "Seller's Warranties." Id. at 10. Two provisions are relevant to this dispute. Paragraph B provided:

> Except as disclosed in writing, Seller represents and warrants that during the period of Seller's ownership of the Property, there has been no use, generation, manufacture, storage, treatment, disposal, release or threatened release of any hazardous substances by any person on, under, about or from the Property; Seller has no knowledge or reason to believe there has been any breach of any environmental laws; and Seller is aware of no use, generation, storage, treatment, disposal, release or threatened release of any hazardous substance on, under, or from the said Property by the prior owners or occupants; Seller knows of no litigation or claims of any kind by any person related to such matters. The Seller has not itself allowed anyone, nor to its knowledge has anyone disposed of or released any hazardous substance on or about the property, and that any activity involving the same has been fully compliant with all applicable federal, state and local laws, regulations, ordinances, including without limitation, environmental laws. Seller will agree and hold harmless Buyer against any and all claims, losses, liabilities, damages, penalties, expenses which Buyer may incur as a result of any violation of this paragraph.

Id. Paragraph D of Article VIII added: "To the best of Seller's knowledge, all activities taken with regard to the Property are fully in compliance with the zoning and planning laws of the City of Chesapeake, Commonwealth of Virginia and the United States of America." Id.

2

The parties executed the agreement in August 2006.  The closing occurred in January 2007 when CPM conveyed the property and MJM signed the promissory note.  In 2013, CPM filed suit against MJM claiming nonpayment of the note.  Relying on the payment terms of the 2006 agreement, CPM claimed the right to buy back the property upon the payment of MJM's "net capital investment" as of the date of the buy back.  CPM requested an order of specific performance enforcing the buy-back option and an award of damages for MJM's failure to comply with it.

MJM counterclaimed, alleging that CPM had violated the warranty provisions of Article VIII by not covering all fly ash on the property with an appropriately thick layer of topsoil.  MJM alleged that it had "been required to expend the sum of $2,000,000" to buy, transport, and place the necessary topsoil cover.  Id. at 25.  These expenses, MJM claimed, fully set off any liability it had on the promissory note and obligated CPM to pay an additional $1.3 million in damages to MJM.  The trial court bifurcated the trial so that the counterclaim would be tried first.  If MJM prevailed on the counterclaim, the court reasoned, it would not be necessary to conduct further proceedings related to CPM's buy-back claim.

At trial, MJM introduced into evidence twenty exhibits, including various agreements concerning the development of the golf course, letters to and from the Virginia Department of Environmental Quality ("DEQ"), and the deposition of CPM's managing member.  The evidence showed that MJM, a day after the closing, wrote DEQ requesting permission to reduce the topsoil cover from 24 to 18 inches.  Id. at 257.  DEQ acknowledged receipt of the letter and approved the reduction of "thickness of cover."  Id.  The DEQ letter also noted that, as of March 3, 2007, it appeared that "ash placement [was] approximately 90% complete and construction of

3

the golf course [was] well under way." Id. CPM continued to place topsoil cover over the fly ash on the property for "four months after [the closing date]." Id. at 557.

The civil engineer who had inspected the topsoil cover for CPM testified that he took "between 20 and 40" soil samples in February and May 2007. Id. at 106; see also id. at 255. The engineer wrote a letter to DEQ, stating that all of the samples "revealed at least 18 [inches] of earthen material." Id. at 255. Based on these findings, DEQ gave its final approval of the work. See id. at 261. MJM completed the construction of the course and opened it to the public in October 2007. A year later, MJM claimed, a heavy rainstorm revealed areas where the topsoil had been washed away, exposing the underlying fly ash. During cross-examination of MJM's golf course superintendent, CPM sought to prove that MJM failed to maintain the course properly and left the topsoil cover vulnerable to rain storms, including a hard "gully washer" in July 2008, which washed away portions of the topsoil cover. Id. at 150-51. MJM relied on expert testimony opining that the sampling techniques used by CPM to determine the depth of the topsoil cover were inadequate and unreliable.

After the 2008 rainstorm, MJM conducted a survey of the property and found many areas where the fly ash was insufficiently covered with topsoil. Intervening to remedy the problem, Dominion — the original fly-ash supplier — agreed to "pay for [MJM's] actual and verifiable out of pocket expenses reasonably incurred" in ensuring that 18 inches of topsoil covered all fly ash previously placed on the property and that the property be maintained in that condition indefinitely. Id. at 497. Another "washout" rainstorm in 2009 exposed additional areas of uncovered fly ash. Id. at 142. Between 2009 and 2014, MJM incurred over $1.5 million in expenses maintaining the topsoil cover on the golf course. Dominion paid for "all of those expenses," as well as MJM's "operational losses" and attorney fees. Id. at 189-90.

4

The trial court held that the 2006 agreement was unambiguous and that its meaning would be discerned within the boundaries of "the four corners of the document." Id. at 699. Viewing Article VIII from this perspective, the court agreed with MJM's assertion that "CPM breached the warranty requirements in the Contract by failing to place the required 18 inches of topsoil on top of the amended ash on the property as mandated by the Conditional Use Permit and state regulations," id. at 736, thus entitling MJM to disregard the promissory note. Based upon this finding, the trial court canceled the note and awarded MJM $694,357.60 in damages, including the out-of-pocket expenses fully reimbursed by Dominion. This ruling in favor of MJM's counterclaim necessarily barred CPM's original buy-back claim, as the trial court held in its final order.

CPM objected to the final order, contending, among other things, that the trial court never identified what language in the warranty provision required CPM to provide the 18-inch topsoil cover. As CPM had done in an unsuccessful pretrial summary judgment hearing, id. at 44-49, CPM then parsed each phrase within the warranty provisions, asserting that nowhere did any of the warranties expressly or implicitly place any duty on CPM to cover the fly ash with 18 inches of topsoil. The trial court disagreed and entered the final order without further comment.

## II.

On appeal, CPM challenges the trial court's interpretation of the warranty provisions, the factual finding that CPM violated the provisions, and the method of calculating damages. We address only the first issue, as it is a threshold point favorable to CPM that necessarily requires a reversal.[1]

---

[1] The trial court held that the collateral source rule applied to this purely contractual dispute. We have never applied the rule outside the tort context. See generally Acuar v. Letourneau, 260 Va. 180, 190-91, 531 S.E.2d 316, 321 (2000) (acknowledging that "neither the

5

A.

The trial court interpreted the warranty provisions of Article VIII to require CPM to ensure that at least 18 inches of topsoil covered the fly ash previously placed on the property. Neither the court's remarks from the bench nor its final order identified which specific clause within Article VIII supports this interpretation. The only arguable warranties come from paragraphs B and D of Article VIII, titled "Seller's Warranties." J.A. at 10.

Paragraph B includes three sentences. The first is comprised of 113 words separated by various commas and semicolons. When decoupled, the first sentence includes several discreet warranties:

- Except as disclosed in writing, Seller [CPM] represents and warrants that *during the period of Seller's ownership of the Property*, there has been no use, generation, manufacture, storage, treatment, disposal, release or threatened release of any *hazardous substances* by any person on, under, about or from the Property;

- Seller has no knowledge or reason to believe there *has been* any *breach of any environmental laws*;

- and Seller is aware of no use, generation, storage, treatment, disposal, release or threatened release of any *hazardous substance* on, under, or from the said Property by the *prior owners or occupants*;

- Seller knows of no *litigation* or claims of any kind by any person *related to such matters.*

Id. (emphasis added). The second sentence similarly focuses on any "hazardous substance" on the property: "The Seller has not itself allowed anyone, nor to its knowledge has anyone disposed of or released any *hazardous substance* on or about the property, and that any *activity involving the same* has been fully compliant with all applicable federal, state and local laws,

---

tort policy of this Commonwealth nor the collateral source rule was implicated" in "a contractual [case]"). Given our holding on the breach-of-warranty claim, we need not address CPM's contention that the collateral source rule should not be extended beyond its presently recognized boundaries.

6

regulations, ordinances, including without limitation, environmental laws." Id. (emphasis added). And the last sentence of paragraph B provides a remedy for any breach of these warranties: "Seller will agree and hold harmless Buyer against any and all claims, losses, liabilities, damages, penalties, expenses which Buyer may incur as a result of any violation of this paragraph." Id.

We fail to see how any of these statements could be interpreted as a warranty that CPM would cover the fly ash with at least 18 inches of topsoil. Not one of the four clauses in the first sentence expressly says as much, nor can it be reasonably inferred. MJM presented no evidence that the fly ash was a "hazardous substance" and has conceded on appeal that it is not. See Oral Argument Audio at 19:03 to 19:15.[2] Nor did the trial court ever suggest, much less hold, that it was a hazardous substance. By itself, this uncontested point eliminates the applicability of two of the four warranties included in the first sentence of paragraph B. It similarly sidelines CPM's warranties representing that it was unaware of any litigation or claims "related to *such* matters" or any "activity involving the *same*" on the property. J.A. at 10 (emphasis added).

This analysis of paragraph B, however, leaves unresolved a single phrase within it, warranting that CPM (identified as the "Seller") "has no knowledge or reason to believe there has been any breach of any environmental laws." Id. This "has been" warranty was written in

_____

[2] See generally 40 C.F.R. § 257.50(b) (2015) (classifying "coal combustion residuals," including fly ash "generated from the combustion of coal at electric utilities," as "solid waste" under Subtitle D of the Resource Conservation and Recovery Act rather than hazardous waste under Subtitle C); 9 Va. Admin. Code §§ 20-81-10, 20-85-20 (2015) (classifying "fly ash" and other "coal combustion byproducts" as solid waste rather than hazardous waste); 1 Susan M. Cooke & Christopher P. Davis, The Law of Hazardous Waste: Management, Cleanup, Liability and Litigation § 2.04 (2015) (noting that, as early as 1993, the EPA had excluded fly ash "from hazardous waste regulation" and detailing the 2015 refusal to change the designation of fly ash to "special waste" under "RCRA Subtitle C").

7

the present perfect tense,[3] and no allegation was ever made that CPM knew or should have known of a *prior* violation of environmental laws or a violation that presently existed at the time of closing. Even if there had been a prior or existing violation, MJM did not plead or prove that CPM knew or had reason to know of any environmental violations at the time the contract was closed and the property conveyed. Nor did the trial court make any factual finding suggesting as much.

Only one potential warranty provision remains in Article VIII. Paragraph D added a warranty with respect to zoning and planning laws: "To the best of Seller's knowledge, all activities taken with regard to the Property *are fully in compliance* with the *zoning and planning laws* of the City of Chesapeake, Commonwealth of Virginia and the United States of America." Id. (emphasis added). On appeal, MJM does not rely on paragraph D as a basis for upholding the trial court's ruling.[4] Even so, the trial court's remarks from the bench and its mention of the conditional use permit in the final order suggest that the court may have been relying, at least in part, on this warranty.

Here again, nothing in paragraph D expressly states that CPM warranted that it would cover the fly ash with 18 inches of topsoil by the time of closing. The question, then, is whether such a warranty can be reasonably inferred from paragraph D. We find this interpretative inference untenable on multiple levels.

---

[3] See The Chicago Manual of Style § 5.126, at 237 (16th ed. 2010) (noting that the present-perfect tense "refers to (1) a time in the indefinite past . . . or (2) a past action that comes up to and touches the present").

[4] The statement of facts in MJM's appellee brief does not mention any of the specific warranty provisions in the 2006 agreement. The argument section of MJM's brief relies only on the "extensive environmental warranties" of "Paragraph VIII(B)" and particularly focuses on the clause stating that "any activity involving the same has been fully compliant with all applicable federal, state and local laws, regulations, ordinances." Appellee Br. at 36-37; see also id. at 38 (addressing the "environmental warranties in the Contract").

To begin with, paragraph D's warranty speaks in the present tense: "To the best of *Seller's knowledge*, all activities *taken* with regard to the Property *are* fully in compliance with . . . ." Id. (emphasis added). The activities mentioned are those *already* "taken" — not those *yet to be taken*. Only those already taken could even be within the "Seller's knowledge" at the time of the contract. Id. The warranty, moreover, only says that the activities taken "are" fully in compliance — not that future activities will remain forever in compliance. Nothing in this provision can be reasonably understood to imply that the property will be in perpetual compliance after the contract closes and the title is transferred.

Equally important, the warranty in paragraph D speaks of compliance not with any environmental laws, but with "zoning and planning laws." Id. Neither MJM nor the trial court ever identified any specific zoning or planning laws that might have been violated. Though not expressly tying its argument to paragraph D of Article VIII, MJM argues that the conditional use permit issued to CPM in 2001 required it to provide the topsoil cover over the fly ash. The trial court's order implied that this point might have factored into its breach-of-warranty reasoning. We will assume *arguendo* that it did.

The agreement in this case, however, was not just a sales agreement. It was a "Golf Course *Development Agreement* and Contract for Sale & Purchase of Real Estate." Id. at 6 (emphasis added). The ongoing development aspect of the deal was expressed in the paragraph titled "The Nature of the Transaction," which stipulated that "CPM wishes to contract with MJM for MJM to construct the golf course pursuant to the previously issued conditional use permit from the City [of Chesapeake] in accordance with the plans" submitted by CPM to the City. Id. at 7. This paragraph also clarified that "MJM shall have no obligation with regard to any party to develop the Property except *upon closing* of the conveyance of the Property pursuant to this

9

Agreement."  Id. (emphasis added).  This language necessarily negates any interpretation of paragraph D of Article VIII as warranting that CPM would have fully satisfied all conditions of the permit (including any relevant to topsoil coverage of fly ash) prior to closing and the transfer of ownership to MJM.[5]

The conditional use permit, moreover, said nothing specifically about the need to cover the fly ash with a topsoil cover.  The permit simply required compliance with applicable laws "relating to the use of 'fly ash'" deposited on the proposed golf course site.  Id. at 240.  The only laws mentioned by either party in this case applicable to fly ash are the DEQ regulations requiring "the owner or operator" (CPM before the sale and MJM after the sale) of a site containing "fossil fuel combustion products" (including fly ash) to place a "final cover system" (in this case, 18 inches of topsoil) on top of the product "[u]pon reaching the final grade" consistent with DEQ approved "closure criteria" for the site.  See 9 Va. Admin. Code §§ 20-85-100, 20-85-120.

Because delivery of fly ash continued well beyond the date of transfer of the property from CPM to MJM, the site was not scheduled for a final cover system until months later.  See 9 Va. Admin. Code § 20-85-140 (requiring "complete closure" no later than "six months after receiving the final volume" of fly ash).  This regulatory milestone, DEQ informed MJM, occurred in October 2007, months after the January 2007 closing of the agreement.  See J.A. at 261-62.  Thus, no matter how the warranty provisions are interpreted, the trial court erred in holding that the conditional use permit and state regulations mandated that CPM place "the

---

[5] MJM argues that CPM never made this argument in the trial court and, thus, cannot make on for the first time on appeal.  The record, however, shows that CPM repeatedly argued before the trial court that "[n]owhere within the Contract does CPM warrant that it has placed 18 inches of topsoil on top of the amended ash *or even that the property is fully in compliance with the Conditional Use Permit* and state regulations."  J.A. at 717; see also id. at 718-21, 725, 730; R. at 411, 971, 978.

10

required amount of top soil on the property *prior to closing* as warranted" in Article VIII.  Id. at 736 (emphasis added).  There never was such a warranty, and even if there had been, it could not have been violated prior to closing.

B.

Several remaining aspects of MJM's arguments deserve mention.  For various reasons, however, none of these arguments change our analysis of the dispositive breach-of-warranty issue.

1.

Layered throughout MJM's argument on appeal is a purely thematic point — that this commercial deal, properly understood, somehow presupposed that CPM would be solely responsible for placing the fly ash on the property and covering it up with the requisite amount of topsoil.  MJM supports this thesis with heavy reliance on two documents:  (i) a contract between CPM and VFL Technology Corp., Dominion's mandated "ash management contractor" concerning the fly ash, id. at 242, and (ii) an Operations Plan that MJM construes to suggest that CPM understood its obligations the same way that MJM did, see Appellee's Br. Ex. 1-2.

The VFL contract, however, was never introduced as evidence in this case.  The first time the VFL contract appeared in this case was when MJM attached it as an exhibit to its appellee brief.  It is improper for a litigant to present to an appellate court evidentiary documents outside the trial court record, except in cases, unlike this one, in which judicial notice is appropriate.[6]

---

[6] Judicial notice may be taken of any "factual matter not subject to reasonable dispute in that it is either (1) common knowledge or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."  Va. R. Evid. 2:201.  We have taken judicial notice, for example, of "historical, calendar or 'almanac' facts, such as that a particular date fell on a particular day of the week;" "dictionary definitions and common meanings;" United States census data; and other undisputed information.  Charles E. Friend & Kent Sinclair, The Law of Evidence in Virginia § 3-7, at 205-06 (7th ed. 2012) (collecting

11

See Rule 5:10(a) (limiting the inclusion in the appellate record of documents and exhibits to those which were "offered in evidence" or "filed or lodged" with the trial court).

Furthermore, the Operations Plan initially appeared in this case as an exhibit to MJM's deposition of CPM's managing member. The member stated that while he had no "specific recollection" of the document, he was familiar with the project description. J.A. at 546-47. The Operations Plan, which was drafted in 2002, described the project as a "golf course that is being planned, developed, owned, and will be operated by [CPM]." Id. at 641. In context, CPM had a comprehensive plan to place and cover the fly ash because, five years prior to the agreement with MJM, CPM was the sole owner, operator, and developer of the golf course. Beyond introducing the exhibit as part of the deposition of CPM's managing member, MJM never mentioned the Operations Plan to the trial court. Thus, MJM's attempt on appeal to characterize the Operations Plan as including "requirements" similar to those of the conditional use permit and state regulations is fruitless. See Appellee's Br. at 39.

Equally fatal, however, is that both MJM's thematic argument and its use of matters outside the trial court record have no legal relevance to the issue in dispute. In its counterclaim against CPM, MJM alleged a breach of the warranties in Article VIII of the agreement. MJM never pleaded or proved that it was a third-party beneficiary of any agreement CPM had with Dominion or any other entity. Nor did MJM plead or prove that its damages arose out of a breach, not of Article VIII's warranty provision, but of Article V's condition precedent to closing, that required the parties to determine "in good faith the specific obligations of each of

cases); see, e.g., Hardy v. Board of Zoning Appeals, 257 Va. 232, 233 n.1, 508 S.E.2d 886, 886 n.1 (1999) (taking "judicial notice of the contents" of certain zoning ordinances as the law of a political subdivision, pursuant to Code § 8.01-386; see also Va. R. Evid. 2:202); Vaughan v. Town of Galax, 173 Va. 335, 342, 4 S.E.2d 386, 389 (1939) (refusing to take judicial notice of a fact not shown in the trial court record when that fact should have been "established by extrinsic evidence").

12

them with regard to ash placement" and to set forth their determination in a "development plan." J.A. at 9.[7]  Instead, the case went forward solely on MJM's claim of breach of warranty.  The trial court decided the case based on that claim, and it was the only legal argument advanced by MJM on appeal for affirming the trial court.[8]

2.

MJM also contends that our interpretation of Article VIII's warranty provisions ignores the agreement's anti-merger clause, which stated that the contractual provisions "shall survive closing and not be deemed merged into the deed of conveyance."  Id. at 12.  We disagree.

"The merger doctrine has been long-recognized by this Court."  Abi-Najm v. Concord Condo., LLC, 280 Va. 350, 357, 699 S.E.2d 483, 487 (2010); see also Devine v. Buki, 289 Va. 162, 173-74, 767 S.E.2d 459, 465 (2015).  "The rule is that when a deed is executed and accepted in performance of a prior preliminary contract, the deed, if unambiguous in its terms, and unaffected by fraud or mistake, must be looked to alone as the final agreement of the parties."  Woodson v. Smith, 128 Va. 652, 656, 104 S.E. 794, 795 (1920).  When applicable, "'[t]he merger doctrine deals with extinguishing a previous contract by an instrument of higher dignity,' the deed."  Abi-Najm, 280 Va. at 357, 699 S.E.2d at 487 (quoting Empire Mgmt. & Dev. Co. v. Greenville Assocs., 255 Va. 49, 52, 496 S.E.2d 440, 442 (1998)).

---

[7] Outside of Article V, there is no indication in the record that the parties ever agreed to a "development plan," either before closing or afterwards.  See Opening Br. at 7 (asserting that "[n]o development plan was ever presented at trial").

[8] In the statement of facts of its appellate brief, MJM also draws our attention to a "Second Addendum" to the 2006 agreement that stated that CPM had agreed to pay for unspecified "equipment and manpower to stay ahead of MJM's shaping activities" and to provide confirmation that CPM "is in compliance with DEQ regulations and design plans."  J.A. at 223.  MJM, however, did not plead a breach of this addendum in its counterclaim, the trial court did not rule on its applicability or treat it as a warranty provision, and the argument section of MJM's brief on appeal does not assert a violation of this addendum.

13

Anti-merger clauses seek to protect contractual promises from the merger-by-deed doctrine. See generally Milton R. Friedman, Friedman on Contracts and Conveyances of Real Property § 8.18 (7th ed. 2005) (explaining that "[t]he effect of merger may be qualified by agreement" and that "a contract may effectively provide that all its provisions shall survive"); cf. Miller v. Kemp, 157 Va. 178, 198-99, 160 S.E. 203, 209 (1931) (recognizing the "class of cases" upholding contractual stipulations that are, by their express terms, "not merged in the deed" (citation omitted)). An anti-merger clause, however, does not create new contractual rights; it merely protects preexisting contractual rights (to the extent they need such protection) from being extinguished by a later deed by operation of the merger doctrine.[9]

Nor can an anti-merger clause, unless it expressly says it means to do so, extend a contractual warranty beyond the closing date that, by its very terms, has no post-closing applicability. Therein is the Achilles' heel in MJM's use of the anti-merger clause in this case. Nothing in any clause of Article VIII's warranty provisions warranted that CPM would cover the fly ash on the property with 18 inches of topsoil, either before or after the contract closed. As noted earlier, the parties agree that fly ash is not a "hazardous substance," thereby eliminating the applicability of most of Article VIII(B). Supra at 7. The warranty clause stating that CPM had no reason to believe there "has been" a prior breach of environmental laws similarly has no applicability. The same can be said of the Article VIII(D) warranty that, to the best of CPM's knowledge, all activities on the property "are fully in compliance" with zoning and planning

_____

[9] See generally 14 Powell on Real Property § 81.05[11][e] (Michael A. Wolf ed., 2015) ("Occasionally, a provision expressly states that a specific representation or obligation of the seller will survive the closing of the contract. Use of this statement negates the usual effect of the doctrine of merger on that particular seller responsibility." (footnote omitted)); 12 Thompson on Real Property § 99.06(a), at 239 (Thomas ed. 1994) ("In order to overcome the doctrine of merger, it is necessary to provide that seller's warranties are intended by the parties to survive closing and delivery of the deed of conveyance."); see, e.g., 5A Virginia Forms: Real Estate Transactions No. 16-412 (Supp. 2014).

14

laws. These clauses — addressing only the past and the present — do not have any future, post-closing applicability. The anti-merger clause, therefore, adds nothing to the breach-of-warranty analysis in this case. The warranties in Article VIII had no post-closing effect that needed the protection of the anti-merger clause.

III.

Because the warranty provisions in Article VIII did not require CPM to cover the fly ash with 18 inches of topsoil, the trial court erred as a matter of law in finding a breach of Article VIII and awarding damages to MJM as a result. We reverse the trial court's judgment in favor of MJM on its counterclaim and remand this case to the court for further proceedings on CPM's complaint seeking declaratory and monetary relief related to the alleged buy-back option.

Reversed and remanded.