COURT OF APPEALS OF VIRGINIA

Present:   Judges Malveaux, Raphael and Frucci
Argued at Arlington, Virginia


TRUC "CURT" TRAN, ET AL.

MEMORANDUM OPINION[*] BY
v.         Record No. 0277-23-4          JUDGE MARY BENNETT MALVEAUX
                                          OCTOBER 8, 2024
INDUSTRIAL DEVELOPMENT AUTHORITY OF
 THE TOWN OF FRONT ROYAL AND THE COUNTY
 OF WARREN, VIRGINIA, A/K/A ECONOMIC
 DEVELOPMENT AUTHORITY OF THE TOWN OF
 FRONT ROYAL AND THE COUNTY OF WARREN, VIRGINIA


FROM THE CIRCUIT COURT OF WARREN COUNTY
Bruce D. Albertson, Judge[1]

Federico J. Zablah (J. Chapman Petersen; Chap Petersen &
Associates, PLC, on briefs), for appellants.

Cullen D. Seltzer (L. Lee Byrd; Karissa T. Kaseorg; Sands Anderson
PC, on brief), for appellee.


Truc "Curt" Tran and ITFederal, LLC ("IT Federal") appeal the circuit court's final order

entering partial final judgment in favor of the Industrial Development Authority of the Town of

Front Royal and the County of Warren, Virginia ("EDA"), on the EDA's claims for ultra vires,

conversion, unjust enrichment, and breach of contract and denying their motion to set aside the jury

verdict. On appeal, Tran and IT Federal argue that the circuit court erred because: (1) Virginia does

not recognize ultra vires as an independent cause of action; (2) the conversion and unjust

enrichment verdicts against Tran should have been set aside, as there was no evidence that he ever

---

[*] This opinion is not designated for publication. *See* Code § 17.1-413(A).

[1] Judge Clifford L. Athey, Jr. briefly participated in this case in the circuit court.
Subsequently elected to this Court, Judge Athey did not participate in the consideration or
resolution of this appeal.

personally controlled or withheld property of the EDA or that he personally received a benefit at the EDA's expense; (3) the breach of contract verdict relating to a $2 million promissory note should have been set aside, as it was not a count alleged by the EDA and no evidence was offered to prove a breach of contract; and (4) the breach of contract verdict relating to the $10 million promissory note should have been set aside, as no sufficient evidence was offered to prove a breach of contract. For the following reasons, we affirm the circuit court's ruling.

## BACKGROUND

"We review the evidence in the light most favorable to the [EDA], [as] the prevailing party below." *Morgen Indus., Inc. v. Vaughan*, 252 Va. 60, 62 (1996). "The verdict of the jury in favor of [the EDA], upon which the trial court entered judgment, settles all conflicts of testimony in [the EDA's] favor and entitles [the EDA] to all just inferences deducible therefrom." *Cooper Indus., Inc. v. Melendez*, 260 Va. 578, 584 (2000) (quoting *Pugsley v. Privette*, 220 Va. 892, 901 (1980)).

### The EDA Board

The EDA's mission is to help bring business to the Town of Front Royal and Warren County.[2] The EDA is governed by bylaws and a board of directors comprised of seven volunteer members. To act officially on a matter, the EDA board votes by simple majority during an open session.

Jennifer McDonald was the executive director employed by the EDA from 2008 to 2018. Her job was to carry out the directives of the EDA board. In late 2018, the EDA's attorney discovered that McDonald had used EDA funds to purchase several properties through an LLC ("limited liability company") of which she was a member. For the 2018 and 2019 fiscal years,

---

[2] The EDA is a political subdivision of the Commonwealth created pursuant to the Industrial Development and Revenue Bond Act. *See* Code § 15.2-4903.

EDA audits showed embezzlement of funds by McDonald. No one on the EDA board noticed any financial irregularities prior to 2018.

Avtex Site and Lot Six

In 2000, the EDA was deeded the Avtex property, a previously contaminated "Superfund" site that had been remediated by the Environmental Protection Agency ("EPA"). On September 16, 2014, the EPA sent a letter to the EDA stating that "the remediation of soils in the former [Avtex] plant area is protective for a future industrial/commercial worker to a depth of ten feet." The EDA subsequently subdivided approximately 30 acres of the Avtex site into a commercial property known as Lot Six.

IT Federal Project

In 2014, Tran created an LLC, IT Federal, of which he eventually became the sole member and manager. Tran hoped to raise $40 million in foreign investment to build an information technology project (the "IT Federal project").[3] McDonald and Tran discussed using Lot Six for the IT Federal project, and McDonald brought this plan to the attention of the EDA board. The EDA board also discussed possibly loaning money to IT Federal in connection with the project.

On July 3, 2015, the EDA and IT Federal entered into a purchase contract for Lot Six. The contract provided that IT Federal was to pay $1 for the property and secure a $2 million promissory note by a deed of trust. The contact further provided that the $2 million promissory note would be satisfied upon the completion of certain construction targets: specifically, the issuance of a certificate of occupancy for a building constructed on Lot Six or the expenditure of

_____

[3] Tran wanted to utilize the EB-5 investment visa program, which allows foreign nationals to obtain permanent resident status in the United States for themselves and their families if they invest a certain amount of money in a qualifying new commercial enterprise in certain rural or high unemployment areas. *See* 8 U.S.C. § 1153(b)(5).

$5 million "in construction costs to include hard construction, soft construction and facility improvement costs to the Property."

Pursuant to the purchase contract, on September 16, 2015, IT Federal executed a $2 million promissory note and deed of trust to the EDA, which provided that the note would be satisfied upon completion of the same construction targets set forth in the purchase contract, with a deadline of completion by September 16, 2019. Also on September 16, 2015, the parties executed a second promissory note in which the EDA loaned IT Federal $10 million, to be repaid over a 30-year term.

In early 2017, McDonald told the EDA board that Tran had asked the EDA to modify the construction targets for the property because he did not have as much money for the project as he initially had thought. On February 27, 2017, the EDA and IT Federal entered into a first amendment of the deed of trust which modified the construction targets in relation to the $2 million promissory note and deed of trust. The amendment reduced the expenditure requirement from $5 million to $2 million and extended the deadline for either of these events to September 23, 2020.

### VEDP Grant Money

The Virginia Economic Development Partnership ("VEDP") is the Commonwealth's economic development entity which provides incentives to businesses in the Commonwealth. In October 2014, McDonald emailed Tran and stated that IT Federal would qualify for a grant from a specific VEDP program. In October 2015, VEDP prepared a business proposal for IT Federal that detailed the financial incentives the Commonwealth could offer the project.

In March 2016, Debbie Melvin, a VEDP employee, met with Tran and McDonald to discuss the IT Federal project. Melvin asked IT Federal to provide VEDP with information so the agency could evaluate whether the IT Federal project was eligible for certain grants. VEDP

- 4 -

did not commit to providing any actual funding at this meeting. Following the meeting, Tran did not provide any additional information concerning the IT Federal project to VEDP nor further inquired about grant money. VEDP never provided any grant money or incentives to IT Federal.

In August 2016, McDonald emailed Tran and stated that the EDA had been approved for a grant from the Commonwealth to help develop the Avtex site. She stated that the money could be used for construction of a building for the IT Federal project. Tran testified that he asked for documentation of the grant money, but McDonald refused, so he asked for a memorandum of understanding regarding the funds. That same month, Tran, on behalf of IT Federal, and McDonald, on behalf of the EDA, signed a memorandum of understanding ("first MOU") between IT Federal and the EDA. The purpose of the first MOU was "to establish the terms and conditions relating to the grant that the EDA has received from the State of Virginia for the redevelopment" of the Avtex site, "where the EDA makes available part of this grant to ITFederal for the construction of its new facilities on Lot-6." The first MOU stated that the EDA would provide $1.5 million dollars "from the State of Virginia . . . for the development of ITFederal's new facilities on Lot-6." It also provided that the EDA would "pay ITFederal's vendors and/or contractor's invoices . . . for construction of buildings, utility, and infrastructure" and that "ITFederal will submit to EDA invoices that it receives from vendors/contractors to be paid directly by the EDA." In November 2017, Tran and McDonald signed a first amendment to the first MOU ("amended MOU"). The amended MOU specified that IT Federal could also submit to the EDA invoices for reimbursement for payments to vendors that IT Federal itself had paid.[4]

---

[4] Tran testified that because there was a delay in the EDA paying vendors, he wanted to amend the prior MOU to allow IT Federal to pay vendors directly and then receive reimbursement by the EDA.

No one on the EDA board had knowledge of the MOUs, and the board never voted to approve the MOUs. In regard to the payments made from the EDA to IT Federal, McDonald told the EDA board that the EDA had received a grant from the VEDP for the IT Federal project. She represented to the board that the payments made from the EDA to IT Federal did not consist of EDA funds, but rather it was "grant money that the EDA was responsible for managing." IT Federal received $1,499,986 in payments from the EDA made under the MOUs. Tran directed that these funds be used to pay for construction costs for the IT Federal project building. At trial, Tran acknowledged that he had not filed a grant application for the nearly $1.5 million received under the MOUs, but stated McDonald told him that the EDA itself had done so.

<u>Status of IT Federal Project at Time of Trial</u>

Tran engaged an architect to design the IT Federal project building in 2017 and construction started in January 2018. The building was completed in March of 2020. As of the July 2022 trial, the building did not have a certificate of occupancy. At trial, IT Federal introduced documentation in the form of invoices from architecture and construction firms showing that, by September 23, 2020, it had spent over $2.2 million on construction. Under the terms of the MOUs, IT Federal later received reimbursement from the EDA for some of these invoices.

<u>Jury Trial and Post-Trial Proceedings</u>

In October 2019, the EDA filed an amended complaint in the circuit court seeking damages collectively from a number of defendants, including IT Federal and Tran. The claims against Tran and IT Federal alleged fraud and fraud in the inducement, conversion, conspiracy, unjust enrichment, ultra vires transactions and agreements, and breach of contract.[5]

_____

[5] The complaint alleged 14 separate schemes, all related to McDonald and her alleged conspiracy with the collective defendants to "engage[] in a variety of schemes and artifice to

- 6 -

Tran and IT Federal filed a demurrer to the amended complaint, along with a plea in bar to the breach of contract count. The circuit court denied both the demurrer and plea in bar. Tran and IT Federal filed an answer, with affirmative defenses, to the EDA's amended complaint. Tran and IT Federal also filed a counterclaim, alleging fraud, fraudulent inducement, breach of contract, negligent retention, and fraudulent concealment. EDA filed an answer and a demurrer to the counterclaim, which the circuit court denied.

At trial, at the close of the EDA's evidence, Tran and IT Federal moved to strike, which the circuit court denied. Tran and IT Federal renewed their motion to strike at the close of all the evidence, which the circuit court also denied.

Following deliberation, the jury entered a verdict for the EDA and against Tran individually on the claims for ultra vires, conversion, and unjust enrichment, and awarded compensatory damages against Tran personally in the amount of $1,499,986 plus interest. The jury also entered a verdict for the EDA and against IT Federal for ultra vires, conversion, unjust enrichment, and two counts of breach of contract, and it awarded compensatory damages in the amount of $10,419,327.38, without interest. The jury denied the EDA's fraud and conspiracy claims against Tran and IT Federal, and it found in favor of the EDA on Tran and IT Federal's counterclaims.

Tran and IT Federal moved to set aside the jury verdict. In an order, the circuit court denied the motion and entered its partial final judgment. *See* Rule 1:2. Tran and IT Federal now appeal from this order.

---

unlawfully enrich themselves at the expense of the" EDA, which led to losses for the EDA totaling approximately $21 million.

ANALYSIS

"When parties come before us with a jury verdict that has been approved by the trial court, they hold the most favored position known to the law." *Xspedius Mgmt. Co. of Va., L.L.C. v. Stephan*, 269 Va. 421, 424 (2005) (quoting *Stanley v. Webber*, 260 Va. 90, 95 (2000)). "As a general rule, [w]e will not set aside a [circuit] court's judgment sustaining a jury verdict unless it is 'plainly wrong or without evidence to support it.'" *N. Va. Kitchen, Bath & Basement, Inc. v. Ellis*, 299 Va. 615, 622 (2021) (alterations in original) (quoting *Parson v. Miller*, 296 Va. 509, 524 (2018)). In reviewing a circuit court's denial of a motion to set aside a jury verdict, we consider "whether the evidence presented, taken in the light most favorable to the plaintiff, was sufficient to support the jury verdict in favor of the plaintiff." *Id.* (quoting *Parson*, 296 Va. at 524).

In our role as an appellate court, we review matters of law de novo. *Banks v. Mario Indus.*, 274 Va. 438, 451 (2007). "Because statutory interpretation presents a pure question of law, it is subject to de novo review by" this Court. *Boynton v. Kilgore*, 271 Va. 220, 227 (2006).

## I. Ultra Vires Claims

Tran and IT Federal argue that the circuit court "erred by submitting the claim of 'ultra vires' to the jury and sustaining that finding against [them] and the related damages, because no such cause of action exists in Virginia law."

"A contract of a corporation . . . is *ultra vires*" when it is "outside the object of its creation as defined in the law of its organization, and therefore beyond the powers conferred upon it by the legislature." *Norton Grocery Co. v. People's Nat'l Bank*, 151 Va. 195, 202 (1928) (quoting *Cent. Transp. Co. v. Pullman's Palace Car Co.*, 139 U.S. 24, 59 (1891)). Such a contract "is not voidable only but wholly void, and of no legal effect." *Id.* (quoting *Cent. Transp. Co.*, 139 U.S. at 59). Accordingly, a "corporation is bound only when its officers or

- 8 -

agents by whom it can alone act, if it acts at all, keep within the limits of the chartered authority of the corporation." *Norfolk City v. Chamberlaine*, 70 Va. 534, 541 (1877). This principle extends to contracts entered into by municipalities, *see, e.g.*, *Richard L. Deal & Assocs., Inc. v. Commonwealth*, 224 Va. 618, 622-23 (1983), and, by extension, municipal corporations.

Tran and IT Federal argue that the claim that a contract is ultra vires is not itself a standalone cause of action, but rather a defense; thus, the circuit court erred in submitting ultra vires claims against them to the jury when this doctrine provides a shield, not a sword. We do not, however, reach the merits of this argument because Tran and IT Federal failed to timely present it in the circuit court.

Tran and IT Federal assert that this argument was presented to the circuit court on demurrer, but a review of the record demonstrates that this is not the case. Rather, in their demurrer, Tran and IT Federal argued that, in reference to the ultra vires counts, the amended complaint "fail[ed] to state a claim against Mr. Tran and ITFederal because it does not specify which, if any transactions involving Mr. Tran and ITFederal were *ultra vires*, or how such transactions were not approved in the manner required by law."[6] Tran and IT Federal also failed to argue that an ultra vires contract is not a cause of action during argument on jury instructions. While Tran and IT Federal did object to the circuit court giving three instructions regarding the ultra vires contract claim, they did so on different grounds—that the instructions presented were too expansive in relation to the ultra vires doctrine and that they did not correctly state the authority of the EDA director to enter into contracts. The first and only time at trial that Tran and IT Federal argued that the ultra vires instructions should not have been given to the jury, on

---

[6] Tran and IT Federal argued the same grounds before the circuit court in the hearing on the demurrer.

the grounds that an ultra vires contract is not a cause of action, was in their motion to set aside the verdict.

"No ruling of the trial court . . . will be considered as a basis for reversal unless an objection was stated with reasonable certainty at the time of the ruling, except for good cause shown or to enable this Court to attain the ends of justice." Rule 5A:18. "The contemporaneous objection rule, embodied in Rule 5A:18 in the Court of Appeals . . . , is based on the principle that a litigant has the responsibility to afford a court the opportunity to consider and correct a perceived error before such error is brought to the appellate court for review." *Williams v. Gloucester Sheriff's Dep't*, 266 Va. 409, 411 (2003). "Specificity and timeliness undergird the contemporaneous[]objection rule, animate its highly practical purpose, and allow the rule to resonate with simplicity." *Hogle v. Commonwealth*, 75 Va. App. 743, 755 (2022) (quoting *Bethea v. Commonwealth*, 297 Va. 730, 743 (2019)). Rule 5A:18 is "not limited to evidentiary rulings and require[s] objection while the tribunal is in a position to correct a claimed error." *Williams*, 266 Va. at 411.

Here, Tran and IT Federal did not object to the ultra vires jury instructions on the basis that an ultra vires contract is not a cause of action in Virginia. While they raised this issue in their motion to set aside the verdict, that argument came too late. *See Spitzli v. Minson*, 231 Va. 12, 19 (1986) ("Here, the defendant did make a motion to set aside the verdict, but this does not save him from his failure to object to the instructions which submitted the issues . . . to the jury."); *Nolte v. MT Tech. Enters., LLC*, 284 Va. 80, 97 (2012) (holding that when defendants first objected to the circuit court withdrawing an issue from the jury in a motion to set aside, this objection was untimely as "the reasons for objecting to the grant or refusal of a jury instruction must be presented to the trial court before such objection will be considered on appeal," and "[t]he objection must be made in the trial court when the instruction is tendered" (emphasis

omitted) (quoting *Morgen Indus.*, 252 Va. at 67-68)). In this case, because Tran and IT Federal failed to timely object to the ultra vires jury instructions on the grounds that they now assert on appeal, we conclude that the ultra vires argument presented under this assignment of error has been waived.[7]

## II. Conversion and Unjust Enrichment Claims

Tran contends that the circuit court erred in sustaining the jury's verdicts against him personally on both the conversion and unjust enrichment claims.

"Conversion is the wrongful assumption or exercise of the right of ownership over goods or chattels belonging to another in denial of or inconsistent with the owner's rights." *Economopoulos v. Kolaitis*, 259 Va. 806, 814 (2000). "The 'essence' of the wrongfulness element 'is that the defendant has no legitimate claim to the property or recognized legal justification or excuse for taking possession and control of it.'" *McCants v. CD & PB Enters.,*

---

[7] Under this assignment of error, Tran also argues that the circuit court erred in allowing the jury to consider the ultra vires claim against him personally when the EDA presented no evidence that he, as an individual, entered into any contracts with the EDA. Tran and IT Federal further argue under this assignment of error that the ultra vires claims should not have been submitted to the jury because the MOUs were not ultra vires agreements, and instead were voidable rather than void. We do not reach either argument because neither is encompassed by Tran and IT Federal's assignment of error related to the ultra vires claims. Rule 5A:20(c) requires an opening brief to list "the specific errors in the rulings below." "The object of an assignment of error is to point out the specific errors claimed to have been committed by the court below," thereby alerting the reviewing court and opposing counsel to the "points [upon which] . . . counsel intends to ask a reversal of the judgment or decree, and to limit discussion to those points." *Findlay v. Commonwealth*, 287 Va. 111, 119 (2014) (emphasis omitted) (quoting *First Nat'l Bank of Richmond v. William R. Trigg Co.*, 106 Va. 327, 341 (1907)). Here, Tran and IT Federal's assignment of error states, "The Circuit Court erred by submitting the claim of 'ultra vires' to the jury and sustaining that finding against Defendants Tran and ITFederal LLC and the related damages, because no such cause of action exists in Virginia law." By use of the "because" clause, the wording of this assignment of error clearly limits Tran and IT Federal's argument to whether asserting a contract is ultra vires is a valid cause of action in Virginia. Accordingly, we conclude that the arguments regarding Tran's personal liability and whether the MOUs were voidable rather than void are waived. *See Banks v. Commonwealth*, 67 Va. App. 273, 289-90 (2017) ("This Court is limited to reviewing the assignments of error presented by the litigant . . . [and] do[es] not consider issues touched upon by the appellant's argument but not encompassed by his assignment of error.").

*LLC*, 303 Va. 19, 27 (2024) (quoting Kent Sinclair, *Sinclair on Virginia Remedies* § 12-2, at 12-8 (5th ed. 2016)).

The EDA contends that the jury's verdict against Tran for conversion was not plainly wrong because Tran converted $1,499,986 of the EDA's property when he, working with McDonald, claimed falsely in the MOUs that the EDA had received a $2 million grant from the Commonwealth, $1.5 million of which the EDA designated exclusively for IT Federal's construction costs. Tran argues, however, that he did not convert the nearly $1.5 million paid to IT Federal under the MOUs because the funds were distributed not to him but to IT Federal; thus, he could not have converted the nearly $1.5 million when he never had personal control over the funds.

In addressing Tran's argument, we begin by acknowledging that, although Tran is the sole member and manager of IT Federal, as an LLC, IT Federal itself is a separate entity apart from him. "Like a corporation, a limited liability company is a legal entity entirely separate and distinct from the shareholders or members who compose it." *Mission Residential, LLC v. Triple Net Props., LLC*, 275 Va. 157, 161 (2008). In Virginia, generally, "[a] member of a limited liability company, solely by reason of being a member, is not a proper party to a proceeding by or against a limited liability company." Code § 13.1-1020. And, especially relevant here, an LLC member is not personally liable to third parties for the liabilities of an LLC, "whether such liabilities arise in contract, tort or otherwise, solely by reason of being a member, manager, organizer or agent of a limited liability company." Code § 13.1-1019. "These attributes of an LLC do not change merely because the LLC has only one member." *Erie Ins. Exch. v. EPC MD 15, LLC*, 297 Va. 21, 31 (2019).

But Tran's personal liability for the conversion claim does not derive from his status as a member of IT Federal. Rather, Tran's liability stems from his own tortious acts. Although not

- 12 -

directly addressed in prior Virginia case law, we adopt the general rule from other jurisdictions

that corporate officers "are individually liable to third parties for participating in or assenting to

torts committed by them or their corporation." William E. Knepper et al., *Liability of Corporate*

*Officers and Directors* § 6.07 (8th ed. 2023); *see also* 18B Am. Jur. 2d *Corporations* § 1609

(2015) ("Even if acting on behalf of the corporation and in the course of his or her corporate

duties, a corporate officer who participates in the commission of a tort may ordinarily be held

individually responsible.").[8] "This liability arises from the tortious conduct of the individual and

can be established without the third party claimant piercing the corporate veil, because the

individual is sued as an actor, not as an owner."[9] Knepper, *supra*, § 6.07.

We also conclude that this same principle applies to members and managers of LLCs.

Interpreting a statute similar to Code § 13.1-1019, the Maryland Court of Appeals held that "[a]n

LLC member is liable for torts he or she personally commits, inspires, or participates in because

---

[8] This principle generally applies in our sister states, and has been specifically applied in cases involving conversion. *See, e.g.*, *Consulting Overseas Mgmt. v. Shtikel*, 18 P.3d 1144, 1147 (Wash. Ct. App. 2001) (in conversion case, applying the principle that corporate officers are individually liable to third parties for participating in or assenting to conversion); *Haupt v. Miller*, 514 N.W.2d 905, 907 (Iowa 1994) (same); *Hecker v. Ravenna Bank*, 468 N.W.2d 88, 95 (Neb. 1991) (same); *Citizens Ins. Co. v. Delcamp Truck Ctr., Inc.*, 444 N.W.2d 210, 213 (Mich. Ct. App. 1989) (same); *United States v. Hibernia Nat'l Bank*, 882 F.2d 961, 964 (5th Cir. 1989) (same); *Patrons State Bank & Tr. Co. v. Shapiro*, 528 P.2d 1198, 1203-04 (Kan. 1974) (same).

[9] Tran argues that "at trial . . . the EDA never attempted to pierce the corporate veil of ITFederal, which is a prerequisite of personal liability." "[I]n rare instances, a limited liability company's corporate veil may be pierced to hold a member personally liable." *A.G. Dillard, Inc. v. Stonehaus Constr., LLC*, No. 151182, slip op. at 3 (Va. June 2, 2016) (order). In Virginia, veil piercing is appropriate when an individual uses a corporate entity "to evade a personal obligation, to perpetrate fraud or a crime, to commit an injustice, or to gain an unfair advantage." *C.F. Trust, Inc. v. First Flight Ltd. P'ship*, 266 Va. 3, 10 (2003) (quoting *Greenberg v. Commonwealth*, 255 Va. 594, 604 (1998)). It was unnecessary for the EDA to pierce the corporate veil in this case because Tran's personal liability arose from his own tortious conduct. *See Dep't of Agric. v. Appletree Mktg., L.L.C.*, 779 N.W.2d 237, 247 (Mich. 2010) ("[W]e have never required that a plaintiff pierce the corporate veil in order to hold corporate officials liable for *their own* tortious misconduct, and thus it is unnecessary to pierce the corporate veil in this case. Conversion is an intentional tort, and piercing the corporate veil is not necessary to a determination of personal liability for intentional torts.").

- 13 -

he or she personally committed a wrong, not 'solely' because he or she is a member of the LLC."

*Allen v. Dackman*, 991 A.2d 1216, 1229 (Md. 2010). We likewise conclude that the plain

language of Code § 13.1-1019 only limits liability for LLC members or managers when that

liability derives "solely by reason of being a member [or] manager" of an LLC, and that liability

for a member or manager's own tortious actions does not fall under this restriction of liability.

*See City of Charlottesville v. Payne*, 299 Va. 515, 527 (2021) ("In interpreting a statute, we are

bound by 'the plain language of a statute unless the terms are ambiguous or applying the plain

language would lead to an absurd result.'" (quoting *Boynton*, 271 Va. at 227)); *see also Sturm v.*

*Harb Dev., LLC*, 2 A.3d 859, 868-69 (Conn. 2010) (construing the phrase "solely by reason of

being a member or manager" as "open[ing] the door to other types of liability, such as

common-law liability," due to "the statute's use of the term 'solely'").[10] Accordingly, under the

---

[10] When analyzing LLC statutes containing the same "solely by reason of being a member or manager" language found in Code § 13.1-1019, courts of other jurisdictions are in general agreement that LLC members and managers can be found personally liable for torts they committed. *See, e.g.*, *Lancaster v. Miller*, 319 So. 3d 1174, 1180 (Miss. Ct. App. 2021) (Mississippi law); *Daggett v. Feeney*, 397 P.3d 297, 311 (Alaska 2017) (Alaska law); *16 Jade St., LLC v. R. Design Constr. Co., LLC*, 728 S.E.2d 448, 453-54 (S.C. 2012) (South Carolina law); *People v. Pac. Landmark, LLC*, 29 Cal. Rptr. 3d 193, 199-200 (Cal. Ct. App. 2005) (California law); *Mbahaba v. Morgan*, 44 A.3d 472, 476-78 (N.H. 2012) (New Hampshire law); *White v. Longley*, 244 P.3d 753, 760 (Mont. 2010) (Montana law); *Est. of Countryman v. Farmers Coop. Ass'n*, 679 N.W.2d 598, 602-04 (Iowa 2004) (Iowa law); *Cortez v. Nacco Material Handling Grp., Inc.*, 337 P.3d 111, 119 (Or. 2014) (Oregon law); *Pepsi-Cola Bottling Co. v. Handy*, C.A. No. 1973-S, 2000 Del. Ch. LEXIS 52, at *10-13 (Mar. 15, 2000) (Delaware law); *Bd. of Mgrs. of Beacon Tower Condo. v. 85 Adams St., LLC*, 25 N.Y.S.3d 233, 236-38 (N.Y. App. Div. 2016) (New York law).

This determination also finds support in the comments to the Revised Uniform Limited Liability Company Act ("RULLCA"). Similar to the language found in Code § 13.1-1019, the RULLCA provides that "[a] member or manager is not personally liable . . . for a debt, obligation, or other liability of the company *solely by reason of being or acting as a member or manager*." RULLCA § 304(a) (2013) (emphasis added). Regarding this language, the comments to this section explain that "[b]ecause the member or manager liability at issue is solely vicarious, the shield is irrelevant to claims seeking to hold a member or manager directly liable on account of the member's or manager's own conduct." RULLCA § 304(a), cmt. (2013).

plain language of Code § 13.1-1019, the limited liability associated with the LLC form does not shield a member or manager of an LLC from liability for his or her own torts.

While Tran cannot be held liable solely by virtue of being the sole member and manager of IT Federal, the record contains evidence demonstrating that Tran "personally commit[ted]" the conversion of funds and thus was liable for the conversion. *Allen*, 991 A.2d at 1228; *see also* Knepper, *supra*, § 6.07 ("A director or officer must participate in the tort in order to be liable therefor."). As the sole member and manager of IT Federal, Tran entered into ultra vires MOUs under which the EDA paid IT Federal almost $1.5 million.[11] And "where a contract executed by an agent of the government is *ultra vires* it is void *ab initio* and of no legal effect," *Cnty. of York v. King's Villa, Inc.*, 226 Va. 447, 452 (1983), thus the MOUs were void and failed to transfer ownership of the nearly $1.5 million to IT Federal. Accordingly, the funds at issue at all times belonged to the EDA. Tran directed that these funds be used to pay for construction costs for a building constructed on Lot Six. This evidence established that Tran himself "wrongful[ly] assum[ed] or exercise[d] . . . the right of ownership over goods or chattels belonging to another." *Economopoulos*, 259 Va. at 814.

Even though the funds went to IT Federal's corporate account, and not to Tran personally, he is personally liable for the conversion he committed on behalf of the LLC.

---

[11] While we need not determine whether ultra vires conduct creates a valid cause of action, as discussed *supra*, we do conclude for purposes of this assignment of error that the MOUs entered into by Tran were ultra vires. By statute, the EDA has authority to enter into contracts. Code § 15.2-4905(3). But "all powers" of the EDA, including the power to contract, rest with the EDA board. Code § 15.2-4904. McDonald was not authorized by the EDA board to enter into the MOUs, and thus the agreements were ultra vires. *See Cnty. of York v. King's Villa, Inc.*, 226 Va. 447, 450 (1983) (concluding that a contract setting connection fees was ultra vires and "void and of no effect" when the authority to enter into the contract rested exclusively with the county's Board of Supervisors, yet the county administrator entered into the contract without Board authorization).

- 15 -

Accordingly, the jury was not plainly wrong in its verdict for EDA against Tran on the conversion count as a result of his own tortious actions.[12]

Tran also argues that the circuit court erred in sustaining the jury's verdict on the unjust enrichment claim against him because there was no evidence that he personally received a benefit at the EDA's expense.

"Unjust enrichment is an implied contract action based upon the principle that 'one person . . . may not enrich himself unjustly at the expense of another.'" *CGI Fed. Inc. v. FCi Fed., Inc.*, 295 Va. 506, 519 (2018) (alteration in original) (quoting *Rinehart v. Pirkey*, 126 Va. 346, 351 (1919)). The elements of unjust enrichment are "(1) '[plaintiff] conferred a benefit on [defendant]; (2) [defendant] knew of the benefit and should reasonably have expected to repay [plaintiff]; and (3) [defendant] accepted or retained the benefit without paying for its value.'"

---

[12] Under this assignment of error, Tran also contends that the EDA failed to produce evidence that Tran ever had personal and individualized control over the nearly $1.5 million because nothing in the record indicated that the funds were held separately. "The tort of conversion can also apply to money." *Grayson v. Westwood Bldgs. L.P.*, 300 Va. 25, 73 (2021). While Virginia appellate courts have not specifically addressed whether funds must be held separately in order to be the subject of a conversion claim, Fourth Circuit district courts, analyzing prior Virginia case law, have held that "[u]nder Virginia law, 'money can only be the subject of a conversion claim in limited circumstances, including when it is part of a segregated or identifiable fund.'" *Northstar Aviation, LLC v. Alberto*, 332 F. Supp. 3d 1007, 1020 (E.D. Va. 2018) (quoting *Kancor Ams., Inc. v. ATC Ingredients, Inc.*, No. 1:15-cv00589-GBL-IDD, 2016 U.S. Dist. LEXIS 23325, at *31 (E.D. Va. Feb. 25, 2016)). Assuming without deciding that funds must be part of a segregated or identifiable fund to be the subject of a conversion claim, we reject Tran's argument that the funds here were not part of an identifiable fund. Tran argues that "once the funds were in the control and possession of ITFederal, they were indistinguishable from all other monies held in ITFederal's corporate accounts, which means that the EDA cannot rely on withdrawals made by Mr. Tran from a general corporate bank account as examples of 'conversion.'" The $1,499,986 in EDA funds transferred to IT Federal under the MOUs was noted as a separate line item, titled "Grant Contribution," on IT Federal's own balance sheets. When asked about this entry, Tran testified at trial that "we were allocating the grant reimbursement . . . from the Warren County EDA and we were keeping a separate account so we can make sure we can track it." Even though the money went from the EDA into IT Federal's general corporate account, it was clearly segregated and identifiable.

*T. Musgrove Constr. Co. v. Young*, 298 Va. 480, 486 (2020) (alterations in original) (quoting

*Schmidt v. Household Fin. Corp., II*, 276 Va. 108, 116 (2008)).

Tran argues that no evidence at trial satisfied the first element of unjust enrichment, as it was undisputed that all of the funds transferred under the MOUs went directly to IT Federal, not to him; thus, there was no evidence that the EDA conferred a benefit on him. We, however, do not address this argument on appeal, concluding instead that Tran's acquiescence to the wording of the unjust enrichment jury instruction forecloses consideration of this argument on appeal.

The unjust enrichment instruction given to the jury read as follows:

> To prevail on a claim for unjust enrichment, the Warren EDA must prove by the greater weight of the evidence that
>
> (1) The Plaintiff conferred a benefit on Tran and/or IT Federal;
> (2) The Defendant knew of the benefit and should reasonably have expected to repay Plaintiff; and
> (3) The Defendant accepted or retained the benefit without paying for its value.
>
> You shall find your verdict for the defendant if the plaintiff failed to prove any one or more of the elements above.

This instruction was seemingly worded in this way to cover both unjust enrichment claims, one against Tran individually and one against IT Federal. But the wording of the first element instructed the jury that it could find for the EDA if it found that the EDA had "conferred a benefit on Tran and/or IT Federal," indicating to the jury that it could hold Tran himself liable if the money was received either by Tran *or* IT Federal.

Tran did not object to this jury instruction at trial. "[I]nstructions given without objection become the law of the case and thereby bind the parties in the trial court and . . . on [appellate] review." *Boyd v. Weisberg*, 75 Va. App. 725, 736-37 (2022) (alterations in original) (quoting *Smith v. Commonwealth*, 296 Va. 450, 461 (2018)). "We have clearly stated that an agreed jury instruction becomes the law of the case, even if it imposes 'an inappropriate standard.'" *Id.* at

- 17 -

737 (quoting *Smith*, 296 Va. at 462). "Since jury instructions and verdict forms agreed to by both parties become the law of the case, 'we consider whether the evidence was sufficient to support [the judgment] based upon the instructions given.'" *Id.* (alteration in original) (quoting *Smith*, 296 Va. at 462). Based on the language of the given instruction, the jury could find Tran individually liable for unjust enrichment, even though the funds were directed to IT Federal. Thus, the circuit court did not err in sustaining the unjust enrichment verdict against Tran.[13]

### III. $2 Million Promissory Note Claim

IT Federal argues that the circuit court erred in sustaining the jury verdict on the breach of the $2 million promissory claim, for two reasons—because it was not a count alleged by the EDA in its pleadings, and because no evidence was offered to prove a breach of contract.

### A. Claim Not Alleged in Complaint

IT Federal asserts that none of the EDA's pleadings, including its amended complaint, allege a breach of contract concerning the $2 million promissory note; instead, IT Federal claims, the EDA only sought recovery from it for defaulting on the $10 million promissory note.

---

[13] Tran, under this assignment of error, and IT Federal, in a separate assignment of error, also argue that the circuit court erred in sustaining the jury's conversion and unjust enrichment verdicts because there was an express contract between the parties. Tran and IT Federal are correct in stating that the existence of an express contract between IT Federal and the EDA would prohibit claims against them for conversion and unjust enrichment. Relating to conversion, "[t]o avoid turning every breach of contract into a tort . . . we have consistently adhered to the rule that, in order to recover in tort, the duty tortiously or negligently breached must be a common law duty, not one existing between the parties solely by virtue of the contract." *MCR Fed., LLC v. JB&A, Inc.*, 294 Va. 446, 458 (2017) (quoting *Dunn Constr. Co. v. Cloney*, 278 Va. 260, 267 (2009)). Regarding unjust enrichment, "[t]he existence of an express contract covering the same subject matter of the parties' dispute precludes a claim for unjust enrichment." *CGI Fed.*, 295 Va. at 519. Tran and IT Federal argue that the funds that were allegedly converted or subject to unjust enrichment were allocated pursuant to a contract with existing remedies, namely the MOUs. But, as we noted *supra*, the MOUs were not valid contracts, but rather were ultra vires agreements that were void. Thus, as there was no express contract between the parties, the circuit court did not err denying the motion to set aside on this basis.

- 18 -

Rule 1:4(d) provides that "[e]very pleading shall state the facts on which the party relies in numbered paragraphs, and it shall be sufficient if it clearly informs the opposite party of the true nature of the claim or defense." Under well-settled Virginia law,

> [a] litigant's pleadings are as essential as his proof, and a court may not award particular relief unless it is substantially in accord with the case asserted in those pleadings. Thus, a court is not permitted to enter a decree or judgment order based on facts not alleged or on a right not pleaded and claimed.

*Dabney v. Augusta Mut. Ins. Co.*, 282 Va. 78, 86 (2011) (quoting *Jenkins v. Bay House Assocs. L.P.*, 266 Va. 39, 43 (2003)). "The purpose in requiring 'pleadings is to give notice to the opposing party of the nature and character of the claim, without which the most rudimentary due process safeguards would be denied." *Cirrito v. Cirrito*, 44 Va. App. 287, 315 (2004) (quoting *Boyd v. Boyd*, 2 Va. App. 16, 19 (1986)). "[E]very litigant is entitled to be told by his adversary in plain and explicit language what is his ground of complaint or defense." *Jenkins*, 266 Va. at 43 (quoting *Ted Lansing Supply Co. v. Royal Aluminum & Constr. Corp.*, 221 Va. 1139, 1141 (1981)).

In the factual background section of its amended complaint, the EDA alleged that

> [p]ursuant to the ITFederal Purchase Contract, the ITFederal Site was sold to ITFederal for a nominal purchase price of $2 million, payable by a note from ITFederal to the Warren EDA ("$2 Million Promissory Note"), subject to provisions of the note that provided that the $2 million balance would be forgiven upon completion of certain construction targets . . . as set forth in the ITFederal Purchase Contract.

The EDA further alleged, also in its factual background, that because IT Federal had not satisfied the construction targets, "ITFederal is in breach of contract of the ITFederal Purchase Agreement and the $10 Million ITFederal Borrower Note" and "the Warren EDA provided notice of default to ITFederal as required by both the $2 Million Promissory Note and the $10 Million ITFederal Borrower Note. ITFederal has not cured the default."

- 19 -

In the section of the amended complaint listing the counts alleged, under the section titled, "Count VII – Breach of Contract," the complaint incorporates the prior allegations listed in the factual section of the complaint, but only alleges a breach of the $10 million promissory note:

> ITFederal is in default on the $10 Million ITFederal Borrower Note.  Contemporaneous with the filing of its Motion for Leave to Amend the Complaint, Plaintiff has provided ITFederal with notice of default.  On information and belief, ITFederal cannot cure the default within the 30 days allotted by the $10 Million ITFederal Borrower Note.

In addition, the EDA's prayer for relief does not distinguish between the various counts, and pools all damages sought from all defendants.

While not well-articulated in the amended complaint's breach of contract count, we conclude that the complaint did set forth a claim for breach of the $2 million promissory note in the factual background section of the complaint and that these factual allegations, including the breach of the $2 million promissory note, were incorporated by reference in the breach of contract count.  Here, the EDA alleged in its factual background section that it and IT Federal were parties to a contract, namely, the promissory note; that IT Federal breached the agreement by not fulfilling the construction targets; and that the EDA suffered damages as a result.  These allegations, although not contained in the actual breach of contract count, "clearly inform[ed] the opposite party of the true nature of the claim or defense."  Rule 1:4(d).[14]

---

[14] We further note that the breach of the $2 million promissory note claim was included in the agreed jury verdict form submitted to the jury.  IT Federal failed to timely object to the agreed jury verdict form, as it first raised this argument in its motion to set aside the verdict.  *See Spitzli*, 231 Va. at 19 ("Here, the defendant did make a motion to set aside the verdict, but this does not save him from his failure to object to the instructions which submitted the issues . . . to the jury.").  Thus, any objection to the jury's consideration of the breach of the $2 million promissory note claim due to the EDA's failure to plead it in the amended complaint has been waived on appeal.  *See Boyd*, 75 Va. App. at 736-37 ("[I]nstructions given without objection become the law of the case and thereby bind the parties in the trial court and . . . on [appellate] review." (alterations in original) (quoting *Smith*, 296 Va. at 461)).

B.  Evidence Supporting Breach of $2 Million Deed of Trust Claim

IT Federal next argues that the EDA failed to produce evidence proving that it breached the terms of the $2 million promissory note.

The elements of a breach of contract action in Virginia are: "(1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation."  *Navar, Inc. v. Fed. Bus. Council*, 291 Va. 338, 344 (2016) (quoting *Ulloa v. QSP, Inc.*, 271 Va. 72, 79 (2006)).[15]

At issue here is whether IT Federal breached the terms of the $2 million promissory note by failing to meet the construction targets defined in the note, as modified by the first amendment to the deed of trust.  After the amendment, the $2 million promissory note required IT Federal to pay $2 million to the EDA if it failed to spend $2 million "in construction costs to include hard construction, soft construction and facility improvement costs to the Property" by September 23, 2020.[16]  IT Federal asserts that at trial it introduced documentation showing that it spent more than $2.2 million in hard construction, soft construction, and facility improvement costs on Lot Six.

We reject IT Federal's argument, because it fails to account for how we view the jury's consideration of the evidence on appeal.  While IT Federal asserts that evidence in the record

---

[15] In addition to being a negotiable instrument, *see* Code § 8.3A-104, a promissory note is also a contract.  *See Stimpson v. Bishop*, 82 Va. 190, 200 (1886) ("A bond, promissory note, or simple contract, for the payment of money in any shape or form, is a personal contract . . . ." (quoting *Coles v. Withers*, 74 Va. 186, 197 (1880))).  Accordingly, "[u]nder Virginia common law, breach of a promissory note is encompassed under a breach of contract claim."  *Premier Bank, Inc. v. Tech. Res., Inc.*, No. 1:13-cv-00340, 2013 U.S. Dist. LEXIS 180860, at *13 (E.D. Va. Nov. 26, 2013).

[16] According to the terms of the $2 million promissory note, IT Federal would not have been obligated to pay $2 million to the EDA if it had obtained a certificate of occupancy for the building on Lot Six by September 23, 2020.  The record demonstrates, and IT Federal acknowledges on brief, that no certificate of occupancy for the building had been issued at the time of trial in July 2022.

shows that it spent over $2.2 million in construction costs, the jury was able to evaluate the

evidence and conclude that it was not sufficient to establish that IT Federal had in fact spent $2

million or more on the project. IT Federal introduced invoices from architecture and

construction firms totaling over $2.2 million, and Tran testified that these costs were spent on the

project. But the jury was allowed to discount Tran's testimony that IT Federal spent over $2

million in construction costs, and it was also permitted to discount the documentation provided

regarding the construction costs. Jurors "are the sole judges of the weight and credibility of the

evidence and have the right to discard or accept the testimony, or any part thereof, of any witness

when considered in connection with the whole evidence before them." *Gilliam v. Immel*, 293

Va. 18, 24 (2017) (quoting *Smith v. Wright*, 207 Va. 482, 486 (1966)). Here, the jury was

entitled to evaluate the evidence and find that it did not establish that IT Federal met the $2

million expenditure requirement needed to satisfy the $2 million promissory note.[17]

## IV. $10 Million Promissory Note Claim

IT Federal argues that the circuit court erred in sustaining the claim for breach of the $10

million promissory note against it because the evidence was not sufficient to prove a breach of

---

[17] IT Federal also acknowledges that the $2.2 million it purportedly spent on construction costs included the nearly $1.5 million given to it by EDA under the MOUs. But it argues that the $2 million promissory note "holds no restrictions on where the funds to be used may come from," and thus there was no breach of the contract because it spent over $2 million on the project. We reject this argument because the terms of the $2 million promissory note provided that IT Federal could not have satisfied the construction targets by its wrongful use of the EDA's funds. The $2 million promissory note stated that it would be satisfied in full upon "completion of the Construction Target, defined below, as demonstrated by the Maker," here, IT Federal. Thus, IT Federal could not demonstrate that it had completed the construction targets because it did not actually spend $2.2 million on the project, since it never lawfully possessed nearly $1.5 million of those funds. The jury found that the almost $1.5 million in purported grant money did not belong to IT Federal, as it found that Tran had wrongfully converted this money that at all times belonged instead to the EDA. Because IT Federal did not have a possessory interest in it and could not lawfully spend it, the nearly $1.5 million in funds given under the MOUs could not be used by IT Federal to satisfy the construction targets.

the $10 million promissory note when, under the merger doctrine, the construction targets did not survive after closing.[18]

As recognized in Virginia, the merger doctrine provides that in the case of a sale of real property, "the deed of conveyance represents the final agreement of the parties and all prior agreements, oral or written, are merged into the deed of conveyance." *Empire Mgmt. & Dev. Co. v. Greenville Assocs.*, 255 Va. 49, 52 (1998). "The rule is that when a deed is executed and accepted in performance of a prior preliminary contract, the deed, if unambiguous in its terms, and unaffected by fraud or mistake, must be looked to alone as the final agreement of the parties." *CPM Va., LLC v. MJM Golf, LLC*, 291 Va. 73, 87 (2015) (quoting *Woodson v. Smith*, 128 Va. 652, 656 (1920)). When applicable, "'[t]he merger doctrine deals with extinguishing a previous contract by an instrument of higher dignity,' the deed." *Abi-Najm v. Concord Condo., LLC*, 280 Va. 350, 357 (2010) (quoting *Empire*, 255 Va. at 52).

Here, the $10 million promissory note states that "failure of meeting of the Construction Target, as described in the [purchase contract] executed between [IT Federal] and [the EDA] . . . shall constitute a Default of the Borrower." Turning to the purchase contract, it provides for two alternate construction targets: the issuance of a certificate of occupancy for a building built on Lot Six or the expenditure of $5 million "in construction costs to include hard construction, soft

---

[18] IT Federal also argues, under the assignments of error relating to the breach of the $2 million promissory note and $10 million promissory note, that the EDA had an existing remedy, namely foreclosure under the deed of trust, which it failed to exercise. IT Federal, however, did not assert this argument below in reference to either promissory note, thus we do not consider it on appeal. *See* Rule 5A:18.

construction and facility improvement costs to the Property."[19]  IT Federal argues that the EDA

failed to show that it was in breach of the $10 million promissory note because the clauses in the

purchase contract, including the construction targets, did not survive closing since the contract

merged into the deed post-closing.

We disagree, because the merger doctrine does not apply to the construction targets set

out in the purchase contract.  "Agreements which are collateral to the passage of title and are not

covered in the deed can survive the execution of the deed."  *Empire*, 255 Va. at 54.  The

provisions of a prior contract are collateral to the deed and therefore not merged "if they are

distinct agreements made in connection with the sale of the property, if they do not affect the title

to the property, if they are not addressed in the deed, and if they do not conflict with the deed."

*Abi-Najm*, 280 Va. at 359 (quoting *Beck v. Smith*, 260 Va. 452, 456 (2000)).  The construction

targets in the purchase contract qualify as collateral under each of these conditions: the

construction targets were a distinct agreement made in connection with the sale that did not

affect title to the property, and the construction targets were not addressed in (and do not conflict

with) the deed.  Therefore, the construction targets were collateral to the sale of the property and

---

[19] While the construction targets for the $2 million promissory note had been modified by the first amendment of the deed of trust, allowing for fulfillment of the construction targets with an expenditure of only $2 million in construction costs, that modification only applied to the $2 million promissory note accompanying the deed of trust.  The first amendment to the deed of trust specifically stated that its purpose was to "modify certain terms" of the deed of trust and $2 million promissory note, and it did not reference or address the construction targets for the $10 million promissory note.

survived the execution of the deed.[20]  Thus, we conclude that the jury was not plainly wrong in

finding that IT Federal breached the terms of the $10 million promissory note.[21]

[20] Contrary to this conclusion, IT Federal points to language in the purchase contract that it claims indicates that only certain obligations, not including the construction targets, survive after the closing on the property.  In a section titled "Survival of Warranties," the purchase contract states, "[t]he provisions of this Section 17 and Section 16 shall survive the Closing and delivery of the Deed or any termination of this Agreement prior to the Closing Date."  The specified sections discuss principles relating to the interpretation of the purchase contract.  IT Federal argues that "[a] plain reading of this language indicates that the provisions contemplated that survive after the delivery of the Deed are only those that are expressly referenced within the contract."  We reject IT Federal's interpretation of this language, as our Supreme Court did in *Abi-Najm*.  In that case, the purchase contract had a provision stating that "[t]he terms hereof shall be merged into and extinguished by delivery of the deed at settlement except for Sections 4(b), 5, 17, 18, 21, 22 and 23 which shall survive delivery of the deed and shall not be merged therein."  280 Va. at 355.  The Court held that a provision of the contract concerning flooring, not covered in the sections set out in the anti-merger provision, was collateral to the transfer of title, and thus did not merge into the deed and survived the delivery of the deed.  *Id.* at 359.  Here, as in *Abi-Najm*, the existence of an anti-merger provision does not affect any provisions of the purchase contract that were collateral to the transfer of title, and thus those provisions survived the deed's delivery.

[21] IT Federal further argues that the circuit court erred in letting the jury award damages for breach of contract on the $10 million promissory note because the EDA was the first party to materially breach the terms of the note.  "The first party to materially breach a contract cannot enforce it."  *Denton v. Browntown Valley Assocs.*, 294 Va. 76, 88 (2017).  If an "initial breach is material, the other party to the contract is excused from performing his contractual obligations."  *Mathews v. PHH Mortg. Corp.*, 283 Va. 723, 730 (2012) (quoting *Horton v. Horton*, 254 Va. 111, 116 (1997)).  Here, the purchase contract contained a provision obligating the EDA to deliver a warranty deed free of "mortgage, deeds of trust or other monetary liens encumbering the Property" at the time of the closing, and the parties do not dispute that the EDA delivered a warranty deed to IT Federal with an environmental encumbrance on the property.  IT Federal argues that the EDA first breached the terms of the $10 million promissory note when it failed to deliver a warranty deed free of encumbrances at the time of the closing.  We find no merit in this argument.  First, the purchase contract mandated the EDA to deliver a warranty deed free of "monetary liens," and the encumbrance here was not monetary in nature but rather concerned an environmental covenant.  Second, even assuming that this encumbrance did run afoul of the purchase contract's encumbrance provision and that this provision was collateral to the purchase contract and survived closing, IT Federal would have been able to pursue a breach of contract claim on the purchase contract itself, not on the $10 million promissory note, which was a completely separate contract and contained no provisions regarding the delivery of title.

## CONCLUSION

For the foregoing reasons, we affirm the judgment of the circuit court.

*Affirmed.*